Marguerite STASTNY, Plaintiff,

v.

SOUTHERN BELL TELEPHONE AND TELEGRAPH COMPANY, Defendant.

Lillie ANDREWS, Plaintiff,

v.

SOUTHERN BELL TELEPHONE AND TELEGRAPH COMPANY, Defendant.

Texie SPRINGS, Plaintiff,

v.

SOUTHERN BELL TELEPHONE AND TELEGRAPH COMPANY, Defendant.

Mary ROGERS, Plaintiff,

v.

SOUTHERN BELL TELEPHONE AND TELEGRAPH COMPANY, Defendant.

Nos. C–C–75–22, C–C–75–374, C–C–76–117 and C–C–76–144.

United States District Court,
W. D. North Carolina,
Charlotte Division.

March 20, 1978.

Partial Judgment April 5, 1978.

Order of Reference to a Master
May 12, 1978.

■■■

See also D.C., 77 F.R.D. 662.

George S. Daly, Jr., Walter H. Bennett, Jr., and Durant W. Escott, Casey, Daly & Bennett, Charlotte, N. C., for plaintiffs.

Vincent L. Sgrosso, Southern Bell Tel. & Tel. Co., Lawrence Ashe, Jr., Richard R. Boisseau and Duane C. Aldrich, Kilpatrick, Cody, Rogers, McLatchey & Regenstein, Atlanta, Ga., John T. Allred and Robert D. Dearborn, Moore & Van Allen, Charlotte, N. C., for defendant.

James O. Cobb, Charlotte, N. C., for special master.

## ORDER ALLOWING INTERIM ATTORNEYS' FEES

McMILLAN, District Judge.

Plaintiffs have requested an interim award of counsel fees. Plaintiffs have prevailed in the litigation. They have established a right to back pay covering periods of several years on the part of several named plaintiffs, and they have established rights to back pay on the part of others in a rather large class of women employed in management by Southern Bell Telephone and Telegraph Company in North Carolina.

More importantly, they have established the right of women to equal treatment and equal promotion to and within the management class of the defendant employer, and have thereby obtained prospective relief and a substantial change in practice (as opposed to the declared policy) of this very large employer.

Plaintiffs as prevailing parties are entitled to an award covering their reasonable counsel fees and their costs and expenses to date. *Van Hoomissen v. Xerox,* 503 F.2d 1131 (9th Cir. 1974); *Patterson v. American Tobacco Co., et al.,* 9 EPD ¶ 10,-039 (E.D.Va.1974). The purpose of counsel fees is "to make sure that Title VII works." *Culpepper v. Reynolds Metals Co.,* 421 F.2d 888, 891 n. 3 (5th Cir. 1970).

In arriving at this fee the court has considered the factors discussed and considered in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974) and in *Swann v. Charlotte-Mecklenburg Board of Education,* 66 F.R.D. 483 (W.D.N.C.1975). Those factors include the following:

1. *The Results Obtained.*—Plaintiffs have prevailed on all major points. This suit may result in compensation for many of defendant's employees who would not otherwise have been compensated for defendant's sex discrimination against them, and will result in injunctive relief beyond that already effected by the consent decrees.

2. *The Difficulty and Novelty of the Case.*—This has been a very large case and obviously a difficult one to manage and comprehend. Discovery was extensive. The defendant served many documents on the plaintiffs at late dates. The court initially excluded most of these documents from evidence on the ground of their tardy service. As the trial wore on and all involved began to get deadeningly familiar with the evidence, plaintiffs were able to review these documents and withdrew their tardiness objections. In view of the hospitalization of one of plaintiffs' three attorneys after the first week of trial and the necessity for remaining counsel to learn her

parts of the case, together with the added burden of digesting extensive written testimony produced by defendant during the last two days of the trial (at the court's request), plaintiffs' attorneys can legitimately claim to have surmounted great difficulties in keeping afloat and finally getting the record closed. They came to court with their case beautifully organized and presented it with a minimum of wasted motion. The direct examination of all their witnesses, including the expert statistician, took only about two days. They explored very few peripheral matters. They appeared to have intelligently divided among themselves the various subject matters of the case, with no more than two attorneys assigned to any particular subject matter.

The consent decree issues appear novel to the court. There appears to be no helpful precedent for or against the consent decree arguments asserted by the defendant. Plaintiffs' counsel appeared to have understood the use of computers well enough to cross-examine defendant's expert intelligently.

3. *Fees Paid to Opposing Counsel.*—Defendant's outside counsel in this case accrued $304,992.25 in fees (billed and unbilled) and $68,893.88 in expenses (including 1977 computer time) through September 27, 1977. They report 4,877.85 hours of work by attorneys, 321.7 hours worked by summer law clerks, and 899.7 hours worked by paralegals. Neither salaries, time worked, nor expenses of defendant's house counsel Sgrosso and Simon are included in these figures. At various times eleven defense attorneys have overtly participated in this case (Ashe, Stacey, Boisseau, Shields, Aldrich, Sgrosso, Simon, Allred, Hanna, Dearborn and Hodges).

■ This massive defense effort reflects an extended war of attrition. The volumes of depositions and paper and statistics are tremendous. To a considerable degree, plaintiffs had to fight fire with fire, and to perform tasks substantially similar to those performed by the defendant in developing facts and in preparing for depositions and trial. Although no single factor usually controls an award of attorney fees, the fees and expenses of defense attorneys are a significant factor in deciding whether the hours worked by plaintiffs' attorneys were reasonable and necessary.

4. *Time and Labor Involved.*—The plaintiffs' attorneys have filed affidavits indicating that they have expended about 2,500 hours of attorneys' time on this case through September 27, 1977. The defendant contends that plaintiffs' records are erroneous and incomplete and do not support the hours claimed in the affidavits. In part, defendant is correct; plaintiffs' counsel do appear to have made errors in computing time, as shown by the following table:

| | THE COURT'S CALCULATIONS, FROM TIME RECORDS | AFFIDAVITS BY PLAINTIFFS' ATTORNEYS | WOOD AFFIDAVIT AND THE DEFENDANT'S BRIEF |
|---|---|---|---|
| Casey | 7.2 | 13.3 | 0 |
| Daly | 873.2 | 966.9 | 831.7 |
| Judge Bennett | 1,146.65 | 1,140.0 | 1,103.6 |
| Escott | 400.1 | 393.1 | General Objections |
| Martin ) Law | 521.8 | 514.3 | General Objections |
| Byrd ) Clerks | 20.0 | 20.0 | General Objections |
| Paul Escott ) Lay Assistant and Amateur Computerite | – | 67.0 | – |

However, in the nature of things, lawyers' time records can never be fully accurate and complete; time is only one factor—and not a controlling factor—in fee determination; the errors were both favorable and unfavorable to plaintiffs' counsel; and the overall result is affected little if at all by the discrepancies.

There was some duplication in effort by plaintiffs' attorneys due to a mid-trial hospitalization of one attorney. In a trial of this magnitude (requiring several attorneys' attention simultaneously) and of this duration, it is neither unusual, unexpected nor unreasonable that different attorneys will appear for a party, and that some duplication in effort is necessary. Two of defendant's attorneys in Atlanta discontinued their early appearances and their work was taken over by other Atlanta and Charlotte counsel. *See* response to order requiring discovery, document No. 236, filed February 21, 1978.

In a motion filed December 2, 1977, and a brief filed March 14, 1978, the defendant contended that the 2,500 or so hours worked by plaintiffs' attorneys was not reasonable and necessary. The most significant factors bearing on that contention include the complexity of the issues, the magnitude of the evidence, the efficiency of the plaintiffs' attorneys, and the legal effort that the other parties deemed appropriate and necessary to represent their position.

The extensive briefing on numerous legal contentions, a 1,540-page 3-volume transcript of live testimony, the many books of documents, the extended depositions and the multi-hour hearings could alone support a finding that the plaintiffs' attorneys did their job in a reasonable, necessary time. In addition, plaintiffs' counsel have been well-prepared and efficient in all presentations to this court. Finally, the defendant cannot dismiss the relevance of the fact that defendant's outside counsel worked about 4,900 hours on the case—nearly twice as much as the time spent by plaintiffs' counsel. To describe the time worked by plaintiffs' attorneys simply as reasonable and necessary is an understatement. They did an efficient, necessary job.

5. *Reputation, Ability and Experience of Plaintiffs' Counsel.*—Plaintiffs' counsel are thoroughly competent, widely known and fully experienced and successful in the conduct of all types of constitutional and civil rights litigation. They are tenacious and resourceful and have most adequately met the demands on time and energy and other resources which these cases required. They are entitled to compensation as first class lawyers.

6. *Loss of Other Business.*—Representing plaintiffs against Southern Bell in a case of this sort is not likely to gain representation for plaintiffs' counsel of any other utility or sizeable employer of any kind. The time required for this case is enough to prevent these attorneys from taking much other legal business.

7. *Fees Customarily Charged for Similar Services.*—Fees in cases like this have varied all over the financial landscape from figures so low that they do not begin to pay office expenses to rates in the order of $400 to $500 a day. The going rate for experienced lawyers of reasonable ability in this community is approximately $60 to $75 an hour and upwards. According to affidavits on file, plaintiffs' counsel (who operate out of the most economical and convenient law building in the community, and on a relatively modest scale) have to earn something over $25 an hour in order to pay their office expenses before any profit is left for the partners and the tax collectors. For law partners in a responsible firm in Charlotte that expense figure is low.

8. *Whether the Fee is Fixed or Contingent.*—Compensation of plaintiffs' attorneys is dependent upon whether the plaintiffs recover. Not all such cases are successful. Under § 706(k) of Title VII of the Civil Rights Act, 42 U.S.C.A. § 2000e–5(k), courts are expected to award adequate fees to encourage individuals injured by discrimination to seek judicial relief. *Johnson v. Georgia Highway Express, Inc., supra,* at 716.

9. *Expenses and Advancements.*—Plaintiffs' costs and expenses in the amount of

$7,530.34 are reasonable, and will be allowed in full. In addition, an expert witness fee will be allowed for the testimony of Dr. Lonnie Keith in the amount of $300.00.

■ 10. Compensation for the approximately 600 hours of work by law clerks and lay assistants will be made at the rate of $12.50 per hour, which is in line with but somewhat less than the rate at which, in other recent orders, compensation has been awarded for the services of full time paralegal assistants.

■ 11. *Fees Earned To Date*.—Taking all the above factors into account, the court is of the opinion and finds that a reasonable fee for the services rendered to date by plaintiffs' attorneys in this case is $225,-000.00.

■ 12. *Interim Fee Determination*.— Since the case will no doubt be appealed and the result could change the award, no effort will be made at this time to award the full amount of the fees reasonably earned to date. Rather, consistent with the spirit of the act of Congress and with the practicalities of this situation, an interim fee award is made in the amount of $125,-000.00. This will, of course, be credited against any final award of fees that may be made.

IT IS THEREFORE ORDERED:

1. That defendant shall pay to the plaintiffs:

(a) Costs and expenses of $7,530.34.

(b) An expert witness fee for the testimony of Dr. Lonnie Keith in the amount of $300.00.

(c) Interim attorneys' fee in the amount of $125,000.00.

2. That a final assessment of fees and a final fee order will be made at the conclusion of the litigation.

## MEMORANDUM

Findings of fact and conclusions of law are filed simultaneously with this memorandum. The findings and conclusions are the product of: 1) an evidentiary proceeding consisting of live testimony from May 23, 1977, through June 3, 1977, and voluminous documentary evidence; 2) a memorandum of the court's preliminary determination filed on June 29, 1977; 3) proposals and alternative proposals by the parties on the details in the findings of fact and conclusions of law; 4) a December hearing longer than three hours at which most of the disputes over findings and conclusions were argued and decided; 5) voluminous post-trial briefing both before and after the December hearing; and 6) extensive study of the record and deliberation by the court on the evidence.

There are two objections by the defendant to proposed findings and conclusions that they have been considered since the December hearing, and they will be briefly discussed in this memorandum. The defendant has argued: 1) individual claims for back pay by Ms. Stastny, Ms. Andrews, Ms. Springs, and Ms. Rogers were not part of the litigation in the liability stage of the trial, and such matters should not be determined in the findings and conclusions; and 2) under *United Air Lines v. Evans,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977), back pay cannot be awarded for discriminatory failures to promote to vacancies between December 18, 1968 (two years before Ms. Stastny filed her first claim with the Equal Employment Opportunity Commission) and September 18, 1970 (ninety days before Ms. Stastny filed her first claim with the Equal Employment Opportunity Commission).

As part of the determination of liability, plaintiffs clearly intended and the defendant anticipated litigating questions of whether the four women were qualified for promotions without regard to the specific vacancies for which they might have been hired. *Accord,* document number 151, plaintiffs' statement of facts and contentions in response to order for complex cases, filed February 18, 1977 [hereinafter "document # 151"], at pp. 9–32, 47–119, 120–165, 166–193; document number 163, defendants' statement of facts and contentions in response to order for complex cases—rebut-

tal portion of defendant's pretrial statement in the *Stastny* litigation, filed April 19, 1977 [hereinafter "document # 163"], at pp. 2–16, 92–94, 21–29, 95–97, 29–36, 97–98, 36–44, 98–100. All parties also anticipated that the plaintiffs' evidence on liability would involve a comparison of the qualifications and treatment of Ms. Stastny, Ms. Andrews and Ms. Springs with that of specific male employees of the defendant. *See* document # 151, at pp. 15, 55, 89, 112–113, 139–141; document # 163, at pp. 5–6, 22, 24–27, 31–32, 97. In addition, although the plaintiffs did not present evidence on Ms. Rogers' specific claim that, in violation of Title VII, she was not promoted to a position to which Mr. Stamey was transferred, the defense cross-examined her on that claim and then presented Mr. Stamey as a witness. Ms. Rogers' claim about that promotion has thus been fully litigated at the instance of the defendant. The defendant cannot object to a finding that compares Ms. Rogers' and Mr. Stamey's qualifications. (Transcript pp. 82–83, 1179–82, 1217–18.) Findings have thus been made on all of these litigated issues.

The second proposition by the defendant, that back pay may not be allowed for failure to promote to vacancies that were filled more than ninety days before Ms. Stastny filed a charge with the Equal Employment Opportunity Commission, is premised on the theory that a failure to promote is a discrete, dateable wrong. The defendant then cites the Supreme Court's decision in *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977) for the proposition that a discriminatory act that is not the subject of a timely EEOC charge is the equivalent of a discriminatory act which occurred before the enactment of Title VII.

In comparing the *Evans* decision with *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976), the Court clearly limited the impact of *Evans*. About *Evans* they said: "[I]n the case before us we do not reach any remedy issue because respondent did not file a timely charge." The Fourth Circuit Court of Appeals has accepted the proposition that, when a timely charge of discrimi-

nation has been proved valid, discriminatory non-promotions up to two years before the filing of a charge with the EEOC may be the subject of back pay relief. *White v. Carolina Paperboard Corp.*, 564 F.2d 1073, 1082, 1085–87 (4th Cir. 1977).

■ Ms. Stastny has filed a timely charge of discrimination, and the plaintiffs have proven that each of them individually and the class as a whole have been subjected to pervasive discriminatory treatment in employment opportunities after September 18, 1970. The discriminatory failures to promote after December 18, 1968, were a part of the defendant's continuing pattern, practice, and policy of discrimination. Complete back pay relief is warranted and will be awarded in those instances where it is justified by the evidence presented to the master. (It should be noted that Title VII limits back pay to two years before the filing of a charge with the Equal Employment Opportunity Commission. The plaintiffs and class members will never be made whole for the discriminatory acts from 1965 to 1969.)

### FINDINGS OF FACT

Marguerite Stastny, a management employee of the defendant, began this action on January 21, 1975, alleging past and continuing sex discrimination against her by the defendant, in promotion, pay and other terms and conditions of her employment, and seeking back pay and injunctive relief. On April 14, 1975, Plaintiff Stastny amended her Complaint to allege a class action. Lillie Andrews, Texie Springs, and Mary Rogers filed separate but similar actions on December 11, 1975, April 6, 1976, and May 3, 1976, respectively. Plaintiffs Andrews and Springs are currently employed by the defendant as First Level managers. Plaintiff Mary Rogers, a former Second Level management employee, retired in August, 1976. Each alleged a class action. Each has been certified as a class representative. Each plaintiff is a female United States citizen, and resident of Charlotte, North Carolina. Each filed complaints with the

Equal Employment Opportunity Commission as follows: Marguerite Stastny on December 18, 1970, May 17, 1971, August 23, 1971, September 14, 1971, and December 14, 1972; Lillie Andrews on October 20, 1971, January 20, 1972, April 18, 1972, and September 15, 1975; Texie Springs on September 9, 1974; and Mary Rogers on December 17, 1975 (Plaintiffs' Exhibit No. 1, p. 4). Each received "right-to-sue" letters as follows: Marguerite Stastny on January 2, 1975; Lillie Andrews on October 6, 1975; Texie Springs on March 24, 1976; and Mary Rogers on April 15, 1976 (Plaintiffs' Exhibit 1, pp. 5–8).

The defendant is an employer engaged in interstate commerce, and has had fifteen or more employees for each working day in each of twenty or more calendar weeks of the year since at least 1965.

The defendant is a subsidiary company of American Telephone and Telegraph Company, operating in the four-state area of North Carolina, South Carolina, Georgia and Florida. The scope of this action is limited to the defendant's North Carolina operations, and when Southern Bell is referred to hereinafter, reference is to operations within the North Carolina area.

On August 12, 1975, a class action was certified. That order was amended on June 22, 1976, redefining the class to consist of:

a. All females employed in North Carolina in management positions since August 20, 1970, who have been classified, restricted, discriminated against, or otherwise deprived of employment opportunities or status because of their sex, and

b. All females (including female craft employees of the defendant) who, since August 20, 1970, have been denied employment in management positions in North Carolina on account of their sex.

Since Plaintiff Stastny's charge was not received by the EEOC until December 18, 1970, the appropriate class starting date is September 19, 1970.

Plaintiff Stastny was named as a class representative. On March 24, 1976, the cases of Marguerite Stastny, Lillie Andrews, Texie Springs and Mary Rogers were consolidated for discovery and trial, pursuant to Rule 42 of the Federal Rules of Civil Procedure.

Trial was held beginning on May 23, 1977, without a jury. Plaintiffs presented evidence in three varieties: Testimony by Plaintiffs Stastny, Andrews, Springs and Rogers, and by Robert Stastny, husband of Marguerite Stastny and an employee of the defendant, regarding treatment of individual employees; testimony of John J. Ryan, former Vice President and General Manager of Southern Bell in North Carolina, concerning policies and practices of the company; and statistical evidence, including opinions of a statistical expert, Dr. Lonnie Keith.

Defendant presented documentary, statistical evidence and testimony of its expert, Dr. James Gwartney. In addition, defendant presented extensive evidence concerning the genesis and implementation of consent decrees entered into by the defendant and various government agencies in 1973 and 1974, including the 1976 Supplement Order to the 1973 Decree, from witnesses Donald Leibers, Director of Equal Opportunity and Affirmative Action for American Telephone and Telegraph Company; Ed Welch, Equal Employment Opportunity Coordinator for Southern Bell in North Carolina; William H. Brown, former Commissioner and Chairman of the Equal Employment Opportunity Commission; and Harry Brickell, Director of Personnel for American Telephone and Telegraph Company. Defendant also presented the deposition of David Wilson, Vice President of the City National Bank in Charlotte.

Defendant also presented, in written form at the Court's prompting and with plaintiffs' concurrence, the testimony of Atlanta-based Southern Bell employees: Roy Howard, James W. Redmond, Jr., Tommy R. Sommer and Randy Jay. Mr. Redmond also testified and was cross-examined orally in court. Written testimony was also offered by Kathleen Wood of Atlanta.

Defendant also presented testimony of seven current or former employees of Southern Bell in North Carolina.

Arguments were heard on the law and evidence on June 28, 1977. Based upon the evidence presented, the Court makes the following Findings of Fact.

### I. Statistical Evidence and Expert Witnesses—Weight of the Evidence:

During trial, the Court viewed extensive statistical evidence and heard expert testimony from both plaintiffs' and defendant's experts. In addition, both parties expended considerable effort in cross-examination and presentation of evidence designed to impeach data bases underlying the statistical evidence and conclusions, expert and otherwise, to be drawn therefrom.

Inaccuracies in data bases exist on both sides.[1] While these inaccuracies no doubt affected the statistical results, in the main the statistical evidence comparing male and female employees of the defendant merits considerable weight, primarily because its conclusions, though sometimes numerically varying, are generally consistent and mutually corroborative. This is particularly true with regard to plaintiffs' Schedules X, Y, and Z (Plaintiffs' Exhibits 34–86), showing relative positions of employees within the company, entries into management and promotions; defendant's Tables A, B, and C (Defendant's Exhibits 31, 32 and 33), covering the same area; and Tables 21, 23, 25, and 26 in Plaintiffs' Exhibit No. 1, stipulated to by both parties, and showing numbers of men and women at various levels and locations within the company.

Expert testimony concerning regression analyses from both sides, while informative, is less valuable. This results in part because of inaccuracies in the data bases upon which the regressions are founded.[2] There is, however, a more basic consideration. Both sides have admitted the limited utility of regression equations to explain "real world" promotional and pay decisions (Transcript, p. 1303). The Court views this as a significant shortcoming. Regression analysis begins with the assumption that certain independent variables in fact determine the outcome of decisions to raise pay and promote. Such assumptions are intellectually questionable and not grounded upon any solid evidence.[3]

1. One of the claims of inaccuracy made by the defendant is the definition of "promotion" employed by plaintiffs in deciding who was promoted. Plaintiffs defined promotion as a "clear advance in salary class" (Tr. 199). In compiling its tables, defendant confined "promotion" to record entries accompanied by an "81" code change on its computer. Beyond that, defendant's version of promotion is undefined. The Court does not consider either side's choice of definition of promotion inaccurate, one (defendant's) being the company's definition used as standard operating procedure, and the other (plaintiffs') being empirically derived from long hours of interpreting raw data of code changes, salary advances and changes, position changes and the like. The Court also does not consider inaccurate inclusion or exclusion of persons temporarily outside the state when promotion or position change occurred, this simply being a matter of definition of what data will be included or excluded, not made in design or effect to promote a particular result. These items are matters of judgment, which the Court considers to have been rationally exercised on both sides. There has been considerable evidence, however, of differences in actual head counts contained in the computer printouts used by plaintiffs and those used by the defendant. There is no evidence before the Court to explain these differences which will allow an inference that, as a result, more weight should be accorded one side's data than the other. In addition to this, there has been revealed a relatively small number of clerical errors attributable to both sides in compiling the respective data bases. As far as the statistical evidence goes, the Court finds these to be of little ultimate consequence.

2. Inaccuracies and differences in plaintiffs' and defendant's data bases are discussed in part above as they affect statistical evidence. In regard to defendant's data base for its regression analysis, another factor was added (or deleted). Defendant excluded from consideration in some of its regressions those persons (almost entirely female) who accepted relief under the 1973 and 1974 Consent Decrees. While this is not necessarily to be viewed as error, it does create the danger, which the Court recognizes, that women who provide the most cognizable examples of sex discrimination may be excluded from defendant's analysis.

3. Defendant's regressions use certain independent variables that are themselves apparently the result of sex discrimination, as follows:
 (a) The variable "marital status" is suspect, since there is no evidence that an unmarried woman is less likely to be a productive worker than a married man.

The likelihood of accurate conclusions is further endangered by the use of the "stepwise" regression technique, whereby in assigning values to the independent variables to explain salary differences between the sexes, the computer selects first the variable which does the most explaining, lets it explain all of the difference it can, and then goes to the next most explanatory variable, etc., allowing each variable to explain all it can of what is left. Thus, if variables overlap in their explanations, which seems likely to occur, the explanatory power of succeeding variables is discounted.

While much of the statistical evidence is not error free, it contains a minimum of guesswork and provides a sound basis from which inferences and conclusions may be drawn by a fact-finder in the same manner courts and juries have found facts for centuries. The experts' testimony often supports these inferences and conclusions, but sometimes does not. On many occasions, the conclusions produced by the regressions appear to depend in large part on the side producing them and in some instances conclusions by a single expert are self-contradictory. Thus in according weight to statistical proof and expert testimony, the Court has relied heavily on the former in conjunction with testimony of individuals and assigned considerably less weight to the latter for the reasons set out above.

## II. The Management Hierarchy at Southern Bell:

Management employees at Southern Bell are divided horizontally into management levels and vertically into departments. The horizontal levels define one's rank and roughly one's pay. The eleven departments essentially define tasks, e. g., the Marketing Department is responsible for selling systems and equipment; the Plant Department installs and maintains the equipment.

There are six levels of management. At the top, the Sixth Level, is the Vice President and General Manager for North Carolina Operations. Under him at the Fifth Level are department heads, then division level managers (Level Four), and district level managers (Level Three). The subdistrict levels (Levels One and Two) consist of secretarial and clerical employees and supervisors of non-management employees (Level One) and supervisors of First Level employees and complex engineering task workers (Level Two). The approximate numbers of persons at these levels were, on March 31, 1976, as follows:

| Level | Number |
|---|---|
| Third Level and above | 150 |
| Second Level | 526 |
| First Level | 1,330 |
| Total | 2,006 |

Approximately 35% of this total is female.

The four lowest management levels (Levels 1–4) are subdivided into salary classes. Designations for salary classes have undergone repeated changes since 1965, the last major change occurring with the Management Job Evaluation, a 1974 company-wide re-evaluation of jobs, which spawned the current designations, as follows:

| Level | Salary Class |
|---|---|
| 1 | A, B, C, D, E |
| 2 | A, B |
| 3 | A, B |
| 4 | A, B |

As a general rule, pay increases from one salary class to the next. However, it is possible for a manager in one salary class who receives a high performance appraisal from his supervisor to receive a larger salary than persons with low appraisals in the next higher salary class.

The two lowest paying salary classes in Level 1, 1–A and 1–B, though styled as

(b) The variable "salary class" is not a productivity factor but rather is the result that, theoretically, productivity factors would explain. Plaintiffs' Exhibits 170–175 show that salary class was the explanation of from 61% to 86% of the salary differences between men and women for 1972, 1973, and 1975. Thus defendant's alleged most explanatory productivity factor is not explanatory at all. (Plain-

tiffs' expert also used salary class as a variable in some instances with the same result.)

(c) The independent variable "months in salary class" is subject to the same defects as "salary class."

(d) The independent variable "years of schooling" is also male-biased, since defendant has until recently purposely discriminated against women with college degrees.

management positions, are clerical, non-supervisory positions. In that respect they more closely resemble craft positions than management. They are composed almost entirely of women.

Females are, in fact, concentrated in the three lower management levels, which contain 98.5% of the management employees (Tr. 14). The three highest levels (Fourth, Fifth and Sixth) which contain 1.5% of management (Tr. 14) are all male and have been so since at least 1965. Currently, of the approximately 150 persons at Third Level and above, five (3.3%) are female—all at the Third Level (Plaintiffs' Exhibit No. 1, Table 21–C, p. 54).

The number of females at Second Level was insignificant prior to 1972. In 1970, approximately 3 of 237 Second Level managers were female (1%). In 1971, there was little improvement—6 of 256 (2%) (Plaintiffs' Exhibit No. 36). In 1972, the percentage increased to 13.8% (80 of 581). By March 31, 1976, the figure was 15.6% (82 of 526) (Plaintiffs' Exhibit No. 1, Table 21–C, p. 54). A year later the figure had increased to 18.4% (100 of 543) (Defendant's Exhibit No. 35–E).

Management women at Southern Bell are found in considerably larger numbers at First Level, especially in the lower salary classes. In 1970, 62% of the female managers at Southern Bell were in the lowest First Level salary classes (T–3, T–5, T–6, S–1—S–3, 1–3—1–5—roughly the historic precedents of current salary classes 1–A and 1–B, non-supervisory positions). There were no men in these lowest paid non-supervisory positions in 1970 (Plaintiffs' Exhibit No. 35), and the absence of any significant number of men in these largely clerical positions persists today. As of March 31, 1976, males occupied only 14 of 396 positions in Salary Classes 1–A, 1–B and 1–C (3.5%). Those men represented 1.1% of the entire male management population. In comparison, the 382 women in those same non-supervisory levels represented 54.0% of the entire female management population.

At higher, supervisory Level 1 positions, men appear in greater numbers. In 1970,

men occupied 76.4% (761 of 996) of the then rough equivalents of Salary Classes 1–C, 1–D and 1–E. The 761 males in those positions represented 67% of the male managers at Southern Bell in 1970. The 235 women in those positions represented 38% of the female managers at Southern Bell in that year. There was almost no change in these percentages for 1971 (Plaintiffs' Exhibit No. 36). In 1972, female percentages in the highest First Level salary classes began to improve, and the numbers underwent considerable fluctuation as a result of the Management Job Evaluation in 1974. However, by March 31, 1976, the female percentage of Salary Classes 1–D and 1–E (the "supervisory" salary classes under current nomenclature) was only 25.5% (about 2% above the percentage of women in "supervisory" positions in 1970) (Plaintiffs' Exhibit 1, Table 21–C, p. 54). In March, 1976, 33.6% of all female managers were at supervisory First Level positions, compared to 53.5% for men (Plaintiffs' Exhibit No. 1, Tables 21–EE and 21–FF, p. 66).

Considering First Level as a whole, the following figures are significant: In 1970, 67% of the male managers and 99 + % of the female managers were at First Level. In 1971 these figures were little changed (Plaintiffs' Exhibit No. 36). By December 31, 1972, the figures were 48.1% of the men and 88.5% of the women. By March 31, 1976, 54.6% of the male managers at Southern Bell and 87.6% of the female managers at Southern Bell were at the First Level of management.

In terms of the percentage of each management level filled by each sex, a picture of the location of male and female managers at Southern Bell resembles counter-pyramids, with the men at the top and women at the bottom. This state of affairs is no accident, but rather the result of hiring and promotion practices followed at Southern Bell from sometime in the past, at least as far back as 1965, to the present. An examination of these practices reveals how the foregoing results were reached.

III. *Evidence of Discrimination Against Women by Denying Women Promotion From Non-Management into Management:*

The defendant fills approximately 87% of its management vacancies by promotion from non-management. The female percentage of non-management employees at Southern Bell ranged from 66.0% in 1970 downward to 60.9% in 1975 (Plaintiffs' Exhibit No. 1, Table 25, p. 75). During this same period, the female percentage of management employees was considerably less, hovering around 35–37% (Plaintiffs' Exhibit No. 1, Tables 21–A, 21–B and 21–C, pp. 53–54; Defendant's Exhibit No. 32–A).[4] Evidence presented by the plaintiffs shows, at least in part, the reason for this disparity. From 1970 through 1975, the female percentage of persons promoted into management has consistently been smaller than the female percentage of non-management employees—42.9% vs. 66% in 1970; 56.9% vs. 66.6% in 1971; 53.3% vs. 64.7% in 1972; 44.7% vs. 62.7% in 1973; 24.0% vs. 61.9% in 1974; and 57.4% vs. 60.9% in 1975 (Plaintiffs' Exhibit No. 87).

Defendant's denial to women of promotion into management from non-management is part of a pattern of denial to females of entry into management from any source. Prior to 1970, defendant did not hire female college graduates into management positions. Prior to 1970, women were as a matter of policy denied participation in the Initial Management Development Program (IMDP) for North Carolina, a high intensity training program for college graduates entering management, in effect in North Carolina for some years prior to 1965 until 1974. In 1970, one of fifteen IMDP'ers was a woman. In 1971, one of eleven was a woman. In 1972 and 1973, the ratios improved to 4 of 16 and 3 of 10, but the total participation of women in the program from 1965 through 1973 was only 8.7%.

With the exception of 1975 when the only two managers hired were women, between 1965 and 1975 the percentage of managers hired in North Carolina who were women never exceeded 30%, and the female average for the period was 19.6%. This figure compares unfavorably with the female percentage of the outside labor force, 38%, and with census data offered into evidence by the defendant showing the female percentage of various occupations in North Carolina (Defendant's Exhibit No. 27–C).

The Court concludes that the defendant has not discriminated against women in hiring them from outside the company since 1970. However, the Court considers the foregoing evidence on hiring, particularly evidence regarding non-hiring of college women prior to 1971, to support the conclusion that defendant conducted a policy and practice of denying women entry into management which operated to discriminate against non-management women who sought and were qualified for promotion into management since at least December 18, 1968.

IV. *Discrimination Against Women by Denying Them Promotions Within Management:*

Women have been denied promotional opportunities at Southern Bell in two respects. First, as to promotions into upper First Level management positions and above, women have been promoted at slower rates than males.

Level 3 and above: The evidence shows that, as of year-end 1970, there were no women at Level 3 (Plaintiffs' Exhibit No. 35, Table Z–1), and that no women were promoted to Third Level between January 1, 1965 and January 1, 1971. Evidence presented by the plaintiffs shows promotion of only 2 females to Level 3 after January 1, 1971. (Plaintiffs' Exhibit No. 67, Table Y–1). However, the Court notes that tables stipulated as accurate by both parties show

---

4. The discrepancies between percentages of women in management and non-management are even greater when measured by individual departments. (See Plaintiffs' Exhibit 1, Tables 26–A—26–D, pp. 77–80.) For example, in 1972, 6 of the 9 non-management departments were over 95% female (3 of those were 100% female). The female percentages of management employees for those 6 departments were 67.2, 58.6, 18.8, 60.7, 50.0 and 82.9.

two women at Level 3 in 1972, four in 1974, and five in 1976 (Plaintiffs' Exhibit No. 1, Tables 21–B, 21–N and 21–X, pp. 53, 58 and 62). That women were promoted to Level 3 between 1970 and 1975 is confirmed by testimony of John Ryan, former Vice President and General Manager, who stated that two women were promoted to Level 3 in 1971 under his direction. As for men, plaintiffs' and defendant's tables do not show the precise numbers promoted to Level 3 for selected years. However, plaintiffs' evidence shows that in 1971 92.3% of those promoted *from* Level 2 positions were male, in 1972—100%; in 1973—66.6% (2 of 3); and in 1975—90%.

Assuming in fact, as the stipulated tables show, that five women were promoted to Level 3 between January 1, 1971, and March 31, 1976, the female percentage of promotions to Level 3 does not appear disproportionately small for the period when compared to the percentages of women at Level 2 (the logical labor pool for Level 3)—1.3% in 1970 (Plaintiffs' Exhibit No. 35, Table Z–1) to 15.6% in March, 1976 (Plaintiffs' Exhibit No. 1, Table 21–Y, p. 63). However, but for defendant's artificial limitations on female access to Level 2 during this period and before, especially during the earlier years—1970, 1971, and 1972—the pool of women eligible for Level 3 promotions would have been greater and female promotions to Level 3, all things being equal, would have occurred at a greater rate. That such a pattern was and remains in operation at Southern Bell is further supported by the total absence of women above Level 3 to the present day.

Level 2: Promotions of women above then Level 1 prior to 1972 were negligible. Women comprised approximately 1% of the managers at Level 2 in 1970 (3 of 237) and 2% in 1971 (6 of 256) (Plaintiffs' Exhibits 35 and 36). In 1972 salary class nomenclature changed and two first level salary classes (1–10 and 1–11) were redesignated as Level 2. At least in part as a result of that

change, the female percentage at Level 2 increased to 13.8% (Plaintiffs' Exhibit 1, Table 21–A, p. 53; Plaintiffs' Exhibit 37), and it has remained near that figure ever since. (On March 31, 1976, women had increased to 15.6% of the second level, Plaintiffs' Exhibit 1, Table 21–C, p. 54.) A year later the figure was up to 18.4% (Defendant's Exhibit No. 35–E).

Plaintiffs' and defendant's tables do not provide bull's eye information concerning percentages by sex of persons promoted *into* various levels. Rather the tables (Plaintiffs' Exhibits 67–70 and Defendant's Exhibit 31–B) measure numbers and percentages of persons being promoted *from* the various salary classes and record the average level by sex to which they ascended. Still these tables give a rough idea of the sexual ratios of those being promoted. In 1972 it appears that approximately 15% of those promoted to Level 2 were women (Plaintiffs' Table—16.4% and Defendant's Table—14.3%). In 1973 the figure was 22.5% (Plaintiffs' Exhibit 70); and in 1974—22.2% (Defendant's Exhibit 31–B, Table B–1 (1974)). In 1975 the figures diverge. Plaintiffs' tables show 2 of 6 promoted to Level 2 (33.3%) were women (Plaintiffs' Exhibit 70). Defendant's tables show the reverse (4 of 6—66.7% were women) (Defendant's Exhibit 31–B, Table B–1 (1975)).

The female percentage of persons at Level 1 for these years (1972–1975) was between 48% and 52% (Plaintiffs' Exhibit 1, Table 21–A, p. 53; Plaintiffs' Exhibit 39). While Level 1 in a general sense forms the labor pool for persons promoted into Level 2, plaintiffs' and defendant's tables of promotions indicate that in fact most promotions into Level 2 came from supervisory first level positions (1–D and 1–E). In 1972 and 1974 these positions were 42.2% female (Plaintiffs' Exhibit 1, Tables 21–A and 21–B, p. 53). In any case, except for 1975, promotions into second level appear to be well below labor pool percentages.[5]

5. Defendant presented testimony designed to show that the female percentage of promotions to upper First Level management positions and Second Level management positions exceeded

female percentages of the labor pools which fed those positions for the years 1974, 1975, 1976 and 1977 (Defendant's Exhibit 35–F). As part of this proof, defendant offers its own defini-

The same is true of promotions within Level 2. In 1975 the female percentage of Salary Class 2–A (the lower second level salary class) was 22.7%. The female percentage of Salary Class 2–B (the higher second level salary class) was 5.5% (defendant's Exhibit 32–B). This pattern is consistent, with diminishing proportions for women, back to 1970 when there were almost no women in Level 2 in any salary class (Defendant's Exhibit 32–B). Defendant's Tables B–1 in Defendant's Exhibit 31–B show that promotions of women into upper second level salary classes have been, compared to men, almost nonexistent from 1970 through the present.[6] In 1975, for promotions from 2–A, the average promotion was to 2–B for both men and women, but 11 persons promoted were male and only 1 was female (Defendant's Exhibit 31–B). The female percentage of Level 2–A for that year was 22.7%.

Level 1: Women have been promoted into the higher first level salary classes at slower rates than males. Plaintiffs' tables show that prior to 1972 the number of women in the highest first level salary classes (then 1–10 and 1–11) was very small (6.5% in 1970 and 8.9% in 1971) (Plaintiffs' Exhibits 35 and 36). The discriminatory basis of the percentage disparity between males and females in these positions is underscored by the fact that the female percentage of first level management, the logical labor pool for most of the promotions to high first level positions, exceeded 50% during this period.[7] (In craft, another possible source for promotions to high first level salary classes, the female percentage exceeded 60%.) Figures for 1972–1973 are obscured by changes in salary class designations for Classes 1–10 and 1–11 to 2–23 and 2–24 (Second Level positions). However, in 1972, women comprised only 31.7% of salary classes 1–17 and 1–19, the two highest first level salary classes (Defendant's Exhibit 32–B). No figures were available for 1973. In 1974 the female percentage of salary class 1–E (the highest first level position) was 12.5% and in 1975 it was 15.8% (Defendant's Exhibit 32–B). The female percentage of Level 1, the labor pool for most of the promotions to 1–E and its historical predecessors, for the years 1971–1975 hovered around 47%—50%. For the years 1972–1974 the female percentage of salary classes 1–C, 1–D and 1–E (or their historical equivalents) was 42.2%. Under those classes, the other first level classes were 99–100% female (Plaintiffs' Exhibit 1, Tables 21–A and 21–B, p. 54). Again craft was over 60% female. On March 31, 1976, the percentage of Levels 1–D and 1–E which was female was 25.5% compared to the lower levels, 1–A, 1–B and 1–C which was 96.5% (Plaintiffs' Exhibit 1, Table 21–C, p. 54).

While these figures do not actually measure promotions, they show that percentages

---

tion of appropriate "labor pools" for these salary classes. The Court does not view this evidence as very persuasive. The "labor pool" designated by the defendant for Level 2 positions is composed of upper Level 1 positions. A large part of the reason women are not represented in greater numbers in upper First Level positions is that the defendant has discriminated against women in promotion to those positions. Also the composition of this "pool" was changed by the defendant in 1974 and 1976 with the result that the female portion dropped by approximately 17 percentage points. Significantly, before that change, the female percentage of promotions to Level 2 was below the female percentage of the labor pool (as defined by the defendant). After the change, the reverse was true.

The primary problem with this evidence, however, is defendant's method of determining what constitutes its "labor pools"—that is, as defendant's witness testified, the "pools" are simply those groups of employees upon which the company has historically drawn for candidates for promotion to Second and upper First Level positions (Transcript, pp. 828 and 955). In spite of the fact that lower First Level positions are approximately 96% female and craft positions are over 60% female, the historical groups forming the pool for upper First Level (all of which are from lower First Level or craft) are almost all predominantly male. Defendant has shown no business necessity for the use of these groups to form the "labor pools" and has offered no excuse other than tradition and historical practice.

6. As noted previously, Defendant's Exhibit 31, as well as Plaintiffs' Exhibits 67–70, provide no perfect measure of promotional percentages by sex. Still a rough approximation may be derived.

7. See n. 6, supra.

of women in upper first level positions have consistently remained well below the percentage of women in the labor pools. In addition, the tables in Defendant's Exhibit 31–B show that, except for 1972 when there was a shift of upper first level positions to second level, promotions to high first level salary classes (1–10 and 1–11, 1–17 and 1–18 and 1–E) have been heavily disproportionately male considering the labor pool.[8] Plaintiffs' Exhibits 69–70 support this conclusion.

Discrimination against women in promotions is apparent in a second respect. When men and women were promoted from lower First Level salary classes, women were, on the average, promoted to lower salary classes than their male counterparts (and at lower pay). This phenomenon was true of promotions from Salary Classes 1–A, 1–B, 1–C and S–1 (and their historical equivalents, T–1 through T–9, S–2 through S–4, 1–3 through 1–8 and 1–13 through 1–18) for the period 1965 through 1975.[9]

Defendant has presented testimony which tends to show that for certain salary classes for certain years men promoted to those salary classes had, on the average, longer periods between promotions than women promoted to those classes (Defendant's Exhibits 34A–H). These figures are of limited utility because they are limited to the years 1973 through 1976, a period when conditions were improving at Southern Bell under the Consent Decree (the Court notes that for the first year tabulated, 1973, women promoted into salary classes shown in fact had more longevity on the whole between promotions than did males); and they are limited only to those salary classes into which both men and women were promoted, which should exclude a substantial number of lower level women and upper level men; they

are limited to only those persons promoted (men and women) and do not inform concerning persons not promoted—persons upon whom plaintiffs' claims are primarily focused; and they are apparently based on defendant's definition of promotion; and figures showing number of promotions in these tables are often directly contradictory to figures showing numbers of promotions in Defendant's Exhibit No. 31–A.

The effect of defendant's promotion practices is to lodge women in lower salary classes at lower pay than comparable men. The Court finds that this practice has been ongoing since at least January 1, 1965 and continues today, though its effects have been reduced to some degree by defendant's performance under the Consent Decrees.

V. *Discrimination Against Women by Denying Them Pay Equal to Men Within Salary Classes:*

Evidence presented by both plaintiffs and defendant shows that with few exceptions male salaries averaged more than female salaries within salary classes for 1970 through 1975 (Plaintiffs' Exhibits Nos. 35, 36, 37, 38 and 39; Defendant's Exhibit 32–D, Tables A–3 and A–3A). This occurred in spite of the fact that in almost every salary class for almost every year, women exceeded men in average company seniority. In most First Level salary classes where men and women appeared, women exceeded men in average years in current management level. In the lower First Level salary classes, 1–A and 1–B, and their equivalent, women exceeded men in average years in current salary class. There were only 9 occasions from 1970 through 1975 when average female salary exceeded average male salary within a salary class. (See Defend-

---

8. See n. 7, supra.

9. Plaintiffs Exhibit 68, Tables Y–1. (Plaintiffs presented no evidence for the year 1974.) Defendant's promotion tables for the year 1974 (Defendant's Exhibit 31–B, Table B–1), using defendant's definition of promotion, indicate that in promotion from Salary Classes 1–D and 1–18, from which the majority of men were promoted that year, women fared as well on the average as men in new salary class and a

little better than men in new salary. Whether this represents an exception to the pattern established in plaintiffs' tables or is simply the result of defendant's use of a different definition of promotion is unclear. The Court is inclined to give the defendant the benefit of the doubt for these two salary classes in this year (1974). With this exception, the pattern established by the plaintiffs is intact.

ant's Exhibit 32–D, Table A–3: 1970—Salary Classes 1–6 and 1–10; 1971—Salary Classes 7–6 and 1–6; 1972—Salary Class 1–16; 1974—Salary Classes 1–A, 1–B and 2–23; 1975—Salary Class 1–A.) In eight of those nine occasions, women exceeded men in average company seniority, average years in current management level, and average years in current salary class. In the one exception (Salary Class 2–23, in 1974) women exceeded men only in average company seniority. However, there were only two women and one man in the salary class. In addition, on the nine occasions where average female salary exceeded average male salary, the difference between average salaries was usually no more than several hundred dollars per year, and usually occurred in salary classes where there were very few males (Defendant's Exhibit No. 32–D, Table A–3). Where average male salaries exceeded average female salaries within a salary class, the excess was often close to or above $1,000 per year, and in upper level positions approached and exceeded $2,000 per year.

Men are also favored in average starting salaries within salary grades. Using plaintiffs' tables and the groupings of salary classes appearing therein, it is evident that from 1970 through 1975, of the 13 instances in which men and women were hired into the same group of salary classes, men began at higher average salaries than women nine times (Plaintiffs' Exhibits Nos. 45 and 46). Under defendant's tables, the results were similar: Of the sixteen occasions in 1970, 1971, 1972, 1974 and 1975 in which men and women were hired into the same salary classes, men were hired at higher average salaries on twelve occasions (Defendant's Exhibit No. 33–B).

The Court finds no business necessity justification in the evidence presented for the discrepancies in salaries between men and women in the same salary classes, and conclude that the discrepancies are due in large part to sex.

VI. *Pay and Promotional Disparities and the Appraisal System* :

Promotions and pay ratings for management employees of Southern Bell are dependent upon recommendations of one's superiors—primarily one's immediate superior. The form of recommendation most widely relied upon is the annual appraisal, which, by company policy, should be administered, as the name implies, once a year. Forms used for annual appraisals have undergone several metamorphoses through the years, but the appraisals and the policies behind them have remained consistent in the following respects.

1. They are of key importance to one's chances of promotion and to a high pay rating;

2. They normally constitute the primary written record of one's performance in his or her current job and of his or her potential for promotion;

3. They are given by one's immediate supervisor with the concurrence of the next higher supervisor or supervisors;

4. They are based primarily upon subjective evaluation of one's performance in his or her current job and one's potential for performance at higher levels.[10]

The Court considers this latter factor to be highly significant in light of the statistical evidence showing disparity in promotions and pay of men and women. As other courts have noted, where a subjective "best qualified" standard governs promotional opportunities, potential for discrimination against groups with little or no power in the decision making process is magnified.

10. The 1972 and 1974 appraisal plans (MAP and MDEP) and the Salary Administration Plan (SAP) established by the defendant set forth written guidelines for performance appraisal and promotability ratings, and designate specific performance areas for observation and evaluation. Defendant has not shown that these guidelines are in fact used to measure job performance. Even if they were, while these broad and often vague criteria may help a manager appraise or rate a subordinate, they contain no standards for objective measurement of performance, and in all categories evaluations still depend, or may depend, upon primarily subjective assessment.

*Baxter v. Savannah Sugar Refining Corp.*, 495 F.2d 437 (5th Cir., 1974); *Rowe v. General Motors Corp.*, 457 F.2d 348 (5th Cir., 1972).

In addition to the subjective nature of the appraisals, other practices at Southern Bell attested to by individual plaintiffs contribute to this potential for discrimination. Management vacancies are not posted nor formally noticed in any manner. Managers interested in promotion must rely upon the "grapevine" for news of openings above them. Job requirements, descriptions and requisite qualifications are not publicized. There is no formal bidding system or other means by which one may request a promotion and transfer other than a self-initiated oral or written message to supervision or EEO Coordinator. There is no system for peer or subordinate evaluation of a manager's performance or promotability. In short, promotion and pay decisions are, and have been since at least 1965, entirely in the hands of one's superiors—primarily one's immediate boss—and are conferred upon employees based largely upon the boss's opinion of the subordinate's performance.[11]

Most bosses are men. Statistical evidence shows, for example, that in 1972, 70.6% of management employees classed as supervisory were men. In 1976, the figure was higher, 79.8% (Plaintiffs' Exhibit No. 1, Tables 21–A and 21–B, pp. 53–54). Relatively few of the supervisory women were above the First Level [15.9% (82 of 517) in 1972; 26.8% (86 of 325) in 1976]. These conditions make it likely that a woman (or a man) will be rated by a male boss. Individual testimony bears this out. Plaintiff Mary Rogers testified that as a management employee she had had only one female supervisor (in 1952–1953) and that, though she had appraised approximately 150 employees as a manager, she had never appraised a man (Transcript, p. 65). Texie Springs and Lillie Andrews also testified they had never been asked to appraise a man, though both of them have been appraised by women in the Commercial Department, a department which is heavily female (Transcript, pp. 133, 139–140, and 483). Ed Welch, Third Level Equal Employment Opportunity Coordinator for the company, has had 8 to 9 supervisors since beginning with Southern Bell, and none were women (Transcript, p. 914). Plaintiff Texie Springs testified that she had had approximately 22 supervisors at Southern Bell since entering management, only 2 of whom were women.

The operation of an opinion-based appraisal system, largely controlled by one sex, such as the one at Southern Bell, provides an ideal environment for disparate treatment of sexes. In fact, as previously noted statistical evidence shows, that is what has occurred. Evidence comparing male and female appraisal ratings for the year supports this conclusion. For that year, the only year for which these comparisons were made, which, under the historical patterns established in this case the Court would expect to be the year of least disfavor to women, a higher percentage of men received high ratings in both performance and promotability than females (Defendant's Exhibits Nos. 29–A and 29–B). The same pattern appears in figures for Second Level Traffic Department personnel submitted in written testimony by defendant's witness James W. Redmond, Jr. By contrast there has been no *objective* evidence that women are less capable managers at Southern Bell than men. To claim that the 1976 comparison of appraisal results shows this merely begs the question.

Under some circumstances women have been systematically excluded from appraisal altogether. From 1964 through September, 1972, the defendant held annual appraisal conferences attended by the Vice President and General Manager and department heads (Fifth and Sixth Level personnel).

---

**11.** Quotas established under the Consent Decrees have disarmed this system to a degree simply by adding the requirement to promote certain. numbers of women. However, the question of who gets promoted is still largely dependent upon appraisals. For example, a "satisfactory" rating, such as that held by Plaintiff Marguerite Stastny, which means "non-promotable," will prevent the recipient of that rating from being promoted.

The purpose of these conferences was to appraise the performance of Second, Third and Fourth Level management employees, and to chart their potential for future advancement, including in some cases the ultimate level to which they might advance. Exclusion of a Second, Third or Fourth Level manager from appraisal at such a conference severely damaged his or her possibility for promotion. By 1970, 1971, and 1972, there were female management employees in the Second Level at Southern Bell (and at least two Third Level female managers by year-end 1972). However, these female managers were not appraised in the annual appraisal conferences (Transcript, testimony of John Ryan, pp. 415–417). The two women who were promoted to Third Level management in 1971–1972, were apparently promoted in spite of this practice and as a result of direct intervention in their behalf by the Vice President and General Manager, who directed that they be recommended for promotion (Transcript, testimony of John Ryan, p. 408).

The uneven operation of the appraisal system is manifest in the case of the individual plaintiffs. Mary Rogers was not appraised for the years 1965, 1966, 1967, 1972 and 1975 (Transcript, p. 63). The record of the 1971 annual appraisal conference for appraisal of a group of First Level employees, including Mary Rogers, shows that under the promotion ratings given, the men appraised would be promoted within half the time of the women. All of the 13 appraisers were men (Transcript, pp. 59–60).

Appraisals are often undertaken, completed and filed without notice to the person being appraised. In 1975, Texie Springs was rated "A–high" by personnel in the Atlanta office for work done while on assignment in Atlanta. That rating was apparently lowered to "A–mid" by a Fourth Level male manager several links up the chain of command from Mrs. Springs. The Fourth Level manager made the change without having observed Mrs. Springs' performance in her job and without discussing it, either before or after the fact, with Mrs. Springs (Transcript, pp. 127–128).

The practice of not discussing an appraisal with an employee was not confined to Mrs. Springs. Plaintiff Marguerite Stastny testified that, with the exception of one appraisal in 1975, she had never been shown an appraisal by her supervisors (all men) or had the appraisal discussed or explained. She saw appraisals for 1973, 1974 and 1976 for the first time in her attorney's office after commencement of this action. Significantly, in the one appraisal discussed with her she was rated promotable. On the others she was rated non-promotable. Plaintiff Lillie Andrews also testified that a critical appraisal was placed in her file without notice to her (Transcript, pp. 471–472). Under such a system and such treatment an employee is defenseless against unfounded and arbitrary evaluations, for whatever reason, by a supervisor.

Based upon the foregoing the Court finds as a fact that the appraisal system upon which promotions and pay increases are based operates to discriminate against women because of their sex, by downgrading them and by allowing for selective non-appraisal. Further, until at least September, 1972, Second Level women were excluded from one facet of the system altogether, the annual appraisal conference, as a matter of policy. Because the system is largely subjective and open to abuse, it is not and has not been for periods relevant to this action a bona fide merit system under 42 U.S.C. § 2000e–2(h).

VII. *Promotional and Pay Differences and Average Educational Levels*:

On the whole male managers average higher education levels than female managers at Southern Bell. However, this does not justify the disparate treatment in pay and promotion because no correlation has been shown between educational level and job performance. Defendant produced testimony to show that in 1976 men received proportionately more of the highest promotability ratings on annual appraisals (Defendant's Exhibits 29–B and 29–C). The suggested inference is that because men are

better educated, this shows that better educated people perform better. As noted previously, because of the built-in subjectivity, the appraisal system is not a reliable measure of performance. Furthermore, the 1976 data also shows that males received proportionately more of non-promotable ratings given in that year (Defendant's Exhibits 29–B and 29–C). If additional education affected the outcome here, it is difficult to tell in which direction.

The preponderance of evidence in fact suggests that educational level has little effect on one's performance as a manager at Southern Bell. Numerous men at upper level positions, where there are virtually no women, have no more than a high school education [15.4% for Levels 3 and 4 as of December 31, 1975; as of the same date, 33.1% of the men at Levels 3 and 4 had only a junior college degree or had started but not completed college (Plaintiffs' Exhibit No. 1, Table 27, p. 86)]. At Level 2, where there are comparatively very few females (82 of 526 as of March 31, 1976, Plaintiffs' Exhibit 1–Y, p. 63), 40.3% of the men had only a high school diploma and 74.7% did not have a college degree. Apparently a large number of men, without benefit of a college degree, are successfully performing Second, Third and Fourth Level jobs at Southern Bell. It is stipulated that the defendant has never as a company considered the lack of a college education to *per se* be a bar to promotion into any level of management (Plaintiffs' Exhibit No. 1, p. 92).

While the Court views the regression analysis conducted by both experts as limited in value for the reasons previously stated, the results of defendant's regressions support the conclusion that education differences ("years of schooling") explain little of the discrepancy between treatment of men and women. (See Plaintiffs' Exhibits 170–175, which show the percentage of difference between predicted male and female salaries accounted for by each variable suggested. The percentage accounted for by years of schooling ranges from 2.1% in the 1975 to 6.8% in the 1970 table.)

■ By its failure to show that better education means better performance, defendant has failed to show any "business necessity" for any credit, real or imagined, given to education in the pay/promotion process. *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). "If an employment practice which operates to exclude Negroes [females] cannot be shown to be related to job performance, the practice is prohibited." *Griggs*, at 431, 91 S.Ct. at 853.

■ Pushing the education defense further, defendant argues that college graduate men may be more qualified than college graduate women for promotion and higher pay at Southern Bell because male degrees are concentrated in areas of engineering and business (71.4%) while female degrees are concentrated in areas of liberal arts, mathematics and physical sciences (69.8%) (Defendant's Exhibit 27–B). The *Griggs* maxim applies here as well. There has been no showing that business majors or engineers make better managers at Southern Bell than physics, math or English majors. Further, there has been no showing that area of study is a consideration in granting a pay raise or promotion. No management job at Southern Bell requires any particular level of formal education or any training not available within the company (except obviously the Legal Department, where a law degree is required to be a lawyer).[12]

12. In regard to in-company training, though the Court finds no across-the-board policy of sex discrimination, there is considerable evidence that females have been denied cross-training assignments in other positions and departments which would help them advance to higher level management positions and which have been granted to males. The IMDP program provided for such training for the very purpose of preparing candidates for high level assignments (district level +) and females were excluded from the program prior to 1970. In addition, Plaintiffs Texie Springs and Mary Rogers both testified that in the many years they had spent with the company they had never held any sort of "developmental" assignments.

## VIII. *Consent Decrees*:

■ Prior to the 1972 amendments to Title VII the EEOC had no enforcement powers. Commission strategy at that time was to "piggyback" (Tr. 993) on the enforcement powers of other Federal agencies by inducing them to pass regulations requiring that the industries they regulated obey Title VII. The Federal Communications Commission passed such regulations. In 1970, 7% of all charges pending with the EEOC involved one of the Bell system companies. The Commission then decided to intervene in Bell's pending rate case before the FCC. The intervention was allowed and a separate docket was set up and many proceedings held. Out of these proceedings and the negotiations accompanying them grew two Consent Decrees entered in the United States District Court for the Eastern District of Pennsylvania on January 18, 1973 and in May, 1974, between the Bell companies (including Southern Bell), the EEOC, the Department of Labor and other parties. The first Consent Decree was entered on the same day the Complaint and Answer were filed. About ten days passed between the second Complaint and the second Consent Decree (Tr. 765). The actions were not styled class actions and no class action findings were made by the Court. No record notice of the actions is shown to have been given to any non-party. No actual notice is shown to have been given to any plaintiff or class member. In each action the parties waived any requirement that the Decree contain any Findings of Fact or Conclusions of Law. Both Decrees expire in 1979.

The Consent Decrees set up an Affirmative Action Job Class (AAJC) system of classification of management positions, as follows:

| AAJC | Management Level |
|---|---|
| 1 | 3 and above |
| 2 | 2 |
| 3 | 1D, 1E |
| 4 | 1A, 1B, 1C |

(Management Level 1C was transferred from AAJC 3 to AAJC 4 in 1974.) Ultimate Goals of female representation in each AAJC have been set as follows:

| AAJC–1 | No ultimate goal |
|---|---|
| AAJC–2 | 38% |
| AAJC–3 | 38% |
| AAJC–4 | 75% |

There is no requirement that these Ultimate Goals be met by any certain date. The Bell System understood that a 20% Ultimate Goal existed for AAJC–1, but the government did not agree (Tr. 760). The Ultimate Goal for AAJC–4 calls for a decline in the percentage of female employees (i. e., more men hired into historically female clerical, non-supervisory positions). The Ultimate Goals for AAJCs 2 and 3 call for increases in the percentage of female employees. The Consent Decrees expire in 1979. Ultimate Goals are to be met by meeting annual "targets." These "targets" are set by a complicated formula. In general, it calculates the percentage of women available in the "pool" (the other AAJCs from which promotions have historically been made), and requires that at least one and one-half or two times that percentage of "opportunities" (generally, promotions and hires) that occur be assigned to women. Thus women will advance only as "opportunities" occur, and then at not less than the rate of targeted annual percentages. Southern Bell in North Carolina did not fill its required percentage of its "opportunities" with women until August, 1976. It is apparent that no management Ultimate Goals will be met before the Consent Decrees expire. The record thus far is as follows:

Percentage of Females in AAJC

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| 12–31–72 | 1.4 | 13.8 | 42.1 | 100.0 |
| 12–31–74 | 2.8 | 14.0 | 42.1 | 99.3 |
| 3–31–76 | 3.3 | 15.6 | 25.5 | 96.5 |
| 3–31–77 | — | 18.4 | 25.7 | — |
| Ultimate Goal | NA | 38% | 38% | 75% |

Back pay was made available under the 1974 Consent Decree to 156 North Carolina female management employees, in the average amount of about $640. College graduate women not hired directly into the Initial Management Development Program (IMDP) between July 2, 1965 and December

31, 1971 were eligible to qualify for $100 monthly salary increases. The method of computing back pay in the 1974 Consent Decree was essentially an application of Equal Pay Act concepts. Minimum entry rates into each salary band of equivalent jobs were determined, and employees below minimum entry level were raised to it and back pay determined for two preceding years with respect to that benchmark. There was no back pay awarded on a failure-to-promote theory, but only on a failure-to-give-equal-pay-for-equal-work theory. Promotional remedies were prospective only.

Defendant argues that the Consent Decrees bar maintenance of this action as a class action because they dealt with the "class issues" raised by plaintiffs here. Defendant contends that though an individual plaintiff retains all her rights to sue and all non-releasing class members retain their individual rights to sue, an individual plaintiff may not sue as representative of a class. The defendant has made two separate formulations of this argument. The first formulation was advanced in its Brief in support of its Motion to decertify the class. Defendant there argued that the Consent Decrees ordered it to do "precisely" what is sought here (Docket No. 70, p. 2, para. 2). That premise is not correct. Plaintiffs here seek more pay and promotional relief for more people than the Consent Decrees provide. They seek relief prior to the dates of the Consent Decrees. Plaintiffs seek relief for craft and other women not hired into management and seek relief for management women on account of their not being hired into and promoted to higher management levels. These matters were not remedied in the Consent Decrees. No back pay was provided on account of denied entry into or promotion within management on account of one's sex.

Defendant at trial advanced the argument that individual employees may bring an "individual charge" (Tr. 1024/19) based on "individual acts of discrimination against them alone" (Tr. 1027/9), but may not bring a class or individual action based on "sys-temic" matters (Tr. 1019/2–3), such as "systems . . . discriminatory in . . . operation" (Tr. 1019/7–8), or systems based on "a feeling that women couldn't do certain types of jobs." (Tr. 1019/10). The language of the Decree which is asserted to accomplish this result is as follows:

## "EFFECT OF DECREE

A. As to the specific issues identified in the Complaint and Decree, compliance with the terms of this Decree resolves all existing questions *among the parties* of the Bell companies' compliance, for acts or practices occurring prior to the date of this Decree, with the requirements of Title VII of the Civil Rights Act of 1964, as amended, Equal Pay Act of 1963, as amended, and Executive Order 11246, as amended. Moreover, compliance with the terms of the Decree in the future will constitute compliance with such laws, orders and regulations as respects those issues specifically dealt with in this Decree.

B. Acceptance by any person of individual relief ordered in Part A, Section II of this Decree shall constitute a waiver and release by such person of any claims for alleged violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 1981, 1983, Executive Order 11246, as amended, or any applicable state fair employment practice laws or regulations based upon occurrences prior to the date of this Decree as respects those issues dealt with in the Decree." (Emphasis supplied.)

The Court agrees with the defendant's witness William H. Brown, who was Chairman of the EEOC at the time the first Consent Decree was entered, that this language is "assurance to the [Bell] companies that in fact you're not going to turn around and sue them again on the same basis as you did before." (Tr. 1022/20–22). But the quoted portion of the Decrees do not say what defendant contends it says. It speaks of resolving *prior* questions only "among the parties." The *prospective* effect (which

is not said to be only "among the parties") does not speak of "systemic" issues, but of "those issues specifically dealt with in the Decree." Those issues are essentially equal-pay-for-equal-work issues and future promotion and hiring issues. Defendant says that the quoted language prevents a local plaintiff from being a class representative. In effect they say that Rule 23 has been repealed for them and that plaintiffs seeking relief beyond that given by the Consent Decree may prove only specific acts of discrimination directed at them and may not prove their case by showing general patterns and practices of discrimination. The government had the skill and power to obtain consent to Decrees that changed one of the nation's largest employers from an obvious discriminator against women into a company apparently attempting to change the psychology and practices that led to that result. But the government did not have the power to limit the right of persons not parties to those Decrees to plead and prove class actions based on pattern and practice type evidence. The Fifth Circuit has refused to give any such effect to industry-wide consent decrees. In *Rodriguez v. East Texas Motor Freight*, 505 F.2d 40, 66 (5th Cir., 1974), *rev'd on other grounds*, 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977), regarding the nation-wide trucking industry Consent Decree, the Court stated:

"... Private plaintiffs in class actions under Title VII and the United States in 'pattern and practice' suits protect different interests: The Government protects general economic interests in addition to the rights of minorities; private plaintiffs represent only the interests of minority group members. (Citation omitted.) While the Government may be willing to compromise in order to gain prompt, and perhaps nation-wide, relief, private plaintiffs, more concerned with full compensation for class members, may be willing to hold out for full restitution. Finally, we cannot ignore the possibility that, if we permit negotiated settlements by the Government to control the relief accorded in pending private actions against the same defendants, private ac-

tions will be significantly discouraged. Such a result would have a deleterious effect on enforcement of Title VII and would not, in our opinion, be consistent with the intent of Congress."

The Court declines to read any broad exemption from local class actions into the Consent Decrees. The Consent Decrees are given ample accommodation in the Court's formulation of remedies in this case.

The defendant also argues that the Consent Decrees are an "opinion" within the meaning of 42 U.S.C. § 2000e–12(b) and that defendant's good faith conformity with and reliance upon them bars class monetary relief for all matters covered by them.

42 U.S.C. § 2000e–12(b) provides, in pertinent part:

"In any action or proceeding based on any alleged unlawful employment practice, no person shall be subject to any liability or punishment for or on account of (1) commission by such person of an unlawful employment practice if he pleads and proves that the act or omission complained of was in good faith, in conformity with, and in reliance on any written interpretation or opinion of the Commission . . ."

In *EEOC v. AT&T*, 556 F.2d 167 (3d Cir., 1977), the appealing union complained that the Consent Decree "override" resulted that women received promotions that men would otherwise have received under the then obtaining collective bargaining agreement. The Third Circuit held that AT&T could rely on its obligations under the Consent Decrees as against the union, which essentially claimed that obeying the Consent Decrees was "an unlawful employment practice." The situation in the present case is reversed. Plaintiffs do not seek to hold defendant liable for any acts done pursuant to the Consent Decrees, but rather for the acts, patterns, and practices which led to the Consent Decrees which these plaintiffs claim were not completely remedied by the Consent Decrees. To the extent that the defendant has performed pursuant to the Consent Decrees, it is given full credit for

such performance in the Court's formulation of an appropriate remedy.

The EEOC does not consider the Consent Decree to be a "written interpretation or opinion of the Commission" within the meaning of the statute. The Commission's procedural regulations provide, 29 CFR 1601.30:

> "Only (a) a letter entitled 'opinion letter' . . . or (b) matter published and so designated in the Federal Register may be considered a 'written interpretation or opinion of the Commission' within the meaning of Section 713 of Title VII."

The Consent Decrees are not entitled "opinion letters" and are not published in the Federal Register.

### IX. *Laches:*

 For laches to apply defendant must show that plaintiffs have been dilatory in pursuing their claims and that prejudice has thereby resulted to the defendant. Neither of these matters has been shown.

 Plaintiff Stastny filed her first relevant charge with the EEOC on December 18, 1970. Thereafter she actively pursued her claims with the EEOC until the filing of this action. In April, August, September and December, 1971, and in December, 1972, she filed additional charges with the EEOC. In March, 1974, fifteen months after her last charge, the EEOC issued a finding of probable cause. Two or three months later the EEOC informed her that conciliation was underway with defendant (Tr. 628). In the summer or early fall of 1974 the EEOC informed her that conciliation efforts had failed, but requested that she not retain an attorney until they could determine whether her case fell under the Consent Decree (Tr. 628). In October or November of 1974, the EEOC informed her that all conciliation efforts had failed and that she should go ahead and consult an attorney (Tr. 629). Suit was filed two months later. This course of proceedings does not amount to undue delay. Mrs. Stastny filed her initial charges promptly, followed the administrative procedure through to its conclusion and then promptly went to court. Her course

of action is consistent with the purpose of the statute, to settle claims short of the court house where possible.

Defendant has attempted to show prejudice by claiming that the passage of four years between the charge and the suit resulted in loss of documents, unavailability of witnesses, and lapses of memory. A week before Mrs. Stastny filed her first charge the government moved to intervene before the FCC, claiming Bell-system-wide sex discrimination. This action resulted in the Bell system producing about 300 4-inch notebooks of information, some computer tapes, and approximately 130,000 separate documents for government review in that case. The Bell system was clearly on notice that broad charges of sex discrimination were pending against it. If defendant thereafter continued destroying relevant records, routinely or otherwise, it did so with the knowledge that these documents might be pertinent at a later time.

On August 3, 1971 and December 15, 1971 defendant's Personnel Manager acknowledged in writing receipt of at least two of Plaintiff Stastny's EEOC charges. This was notice that these charges might subsequently be litigated, including litigation in a class action.

Defendant claims that it destroyed application forms and other documents between 1970 and 1975. However, it was able to find, a few months before trial, an allegedly complete set of application forms dated as early as 1939, which it used to attack plaintiffs' data base claims. Defendant has not made any particularized showing of prejudice from loss of documents. Defendant has not shown any prejudice from absence of witnesses. It has not shown why it could not have taken the depositions of any material witnesses who had left the company or moved beyond the subpoena power of the Court. It has not shown that any material witness has died since 1971.

### X. *Individual Plaintiffs:*

(a) *Marguerite Stastny:* Plaintiff Stastny began her employment with defendant

on April 28, 1948, as an operator, a craft position in the Traffic Department. Thereafter, she held various craft positions in the Accounting, Marketing and Commercial Departments, until January, 1972, when she was promoted to management as an Account Manager, the position she holds at present. In August, 1966, while she was a Sales Clerk in the Marketing Department, Mrs. Stastny filed her first charge of sex discrimination against the defendant with the Equal Employment Opportunity Commission, and thereafter, in February, 1968, filed an action against the defendant based upon that charge in this court, alleging sex discrimination. That action was settled in February, 1969. As a part of that settlement, on February 24, 1969, Plaintiff Stastny was promoted to Communications Advisor, a craft position in the Marketing Department. While in this position, she filed with the Equal Employment Opportunity Commission on December 18, 1970, the first charge of sex discrimination which is the subject of this action. Subsequent charges followed in 1971 and 1972. The following evidence supports Plaintiff Stastny's allegations of sex discrimination and retaliation by the defendant:

1. A comparison of Plaintiff Stastny with other persons who were Communications Advisors with Mrs. Stastny in the Marketing Department at Southern Bell during 1969, 1970 and 1971, and who remained in the Marketing Department at Southern Bell on December 31, 1975, shows that as of December 31, 1975, compared to the average for males, Marguerite Stastny had approximately:
 —13 years more seniority with the company;
 —5 years more seniority in the Marketing Department;
 —$3,500 per year less salary;
 —Less than half as many promotions since February 2, 1969;
 —Approximately $5,000 less in total pay raises since February 2, 1969 (Plaintiffs' Exhibit 114).

As of December 31, 1975, none of the 12 males in this group had as much company seniority as Mrs. Stastny and only 2 had more time in the Marketing Department. Yet all exceeded her annual salary by at least $1,900 per year (and some by as much as $4,000-$5,000 per year), and all had received more wage increases than she in both numbers of increases and total amount of increases since February 2, 1969, when Mrs. Stastny became an Account Manager. Females in this group, on the whole, fared somewhat better than Plaintiff Stastny, but not nearly as well as males.

2. A comparison of Plaintiff Stastny with the average for male Account Managers in the Marketing Department at Charlotte, North Carolina on December 31, 1975, shows that as of that date, Plaintiff Stastny had over twice the seniority as the average male, approximately the same number of years as an Account Manager, five years more in the Marketing Department, and approximately $3,700 per year less salary. Five of the eight males held Level 2 positions. Mrs. Stastny held a Level 1–E position.

3. Southern Bell has itself determined under the Consent Decree that Plaintiff Stastny has not been given equal pay for equal work (Transcript, pp. 1040, 1045 and 1046).

4. While Marguerite Stastny was a Communications Advisor (a craft position) in 1970 and 1971, at least four vacancies occurred in Account Manager positions in the Marketing Department in Charlotte. Promotion to Account Manager is the usual step up to management for Communications Advisors. Three of the Account Manager vacancies were filled by promoting males. One was filled by a lateral transfer of a female. Of the three males, all had been with the company less time than Mrs. Stastny. One of the males, Don Courtney, promoted from Communications Advisor to Account Manager, had approximately the same education as Mrs. Stastny, less time with the company, and less time in the Marketing Department. He is now Mrs. Stastny's boss.

5. In appraisals by her supervisors, Marguerite Stastny had generally received "sat-

isfactory" and "acceptable" performance ratings which are not likely to bring one immediate recognition. Where a promotability rating has been called for on the appraisals, she has, with the exception of one appraisal on August 14, 1975, been rated "non-promotable." These primarily subjective evaluations contrast sharply with the one completely objective measure of her ability presented at trial—the WATS sales contest conducted among Communications Advisors in Charlotte in 1970. In that contest Mrs. Stastny outsold by a wide margin all other Communications Advisors and in fact, more than doubled the dollar amount of all but two of them. At least a majority of the males who participated in the contest are now Second Level management. One is Plaintiff Stastny's boss. Supervisory appraisals of Marguerite Stastny also contrast with numerous letters of commendation from customers which appear in her personnel file and which attest to her high competence in serving customers of the company.

6. Mrs. Stastny repeatedly asked her superiors for promotion from craft to management between September 19, 1970, and January 1, 1972, and has repeatedly asked for promotion within management since January 1, 1972. Promotional vacancies have occurred for·which she was qualified in both areas. Males with less experience and no more demonstrated competence have filled some of these vacancies and now receive more pay and higher salary classifications. Perhaps the best example of such a male is Don Courtney, Mrs. Stastny's present boss, who testified as a witness for the defendant. Don Courtney was promoted over plaintiff from Communications Advisor to First Level management on September 1, 1971. Like Mrs. Stastny, he was a high school graduate. At the time of promotion, he had approximately 11 years with the company; Plaintiff Stastny had 22. He had spent less than 2 years in the Marketing Department; Mrs. Stastny had spent 9 years. In the 1970 WATS sales contest, Don Courtney's sales totalled $33,-760; Plaintiff Stastny's totalled $146,000. He was promoted to management over one year ahead of Plaintiff Stastny. Since

reaching management, he has been promoted twice, and on December 31, 1975, held a Level 2–B position with a salary of $23,100. On December 31, 1975, Plaintiff Stastny held a Level 1–E position (2 grades below Courtney) with a salary of $16,300. Since February 24, 1969, the date on which Plaintiff Stastny became Communications Advisor, Don Courtney has received 14 wage increases totalling $14,858. Plaintiff Stastny has received 10 such increases, totalling $7,746.

7. The one promotion received by Plaintiff Stastny since filing her charge of sex discrimination in December, 1970, from Communications Advisor (craft) to Account Manager (management Level 1–E), resulted, at least in part, from direct intervention by the then Vice President and General Manager of Southern Bell in North Carolina, John J. Ryan.

8. Plaintiff Stastny has been very outspoken concerning what she believed to be sexually discriminatory practices of the defendant company. This outspokenness has been translated into at least two lawsuits and numerous charges of sex discrimination filed with the Equal Employment Opportunity Commission. As a result, Mrs. Stastny has been criticized by her superiors, accused by them to the Vice President and General Manager of the company of being a troublemaker and mentally disturbed (Transcript, p. 431), and accused of blackmailing her supervisor and threatening the company. An unsigned, undated document in her personnel file criticizes her outspokenness on and disagreement with the defendant's policy in regard to equal employment opportunity. This treatment has operated, under the largely subjective appraisal system, to deny her pay raises and promotions.

9. Defendant has retaliated against the plaintiff by not promoting her husband, Robert E. Stastny. Plaintiff and her husband have been married for approximately 27 years. Robert E. Stastny is a Service Supervisor, a Level 1–E manager, in defendant's Plant Department in Charlotte. He received his last promotion on July 1, 1966, approximately one month before his

wife filed her first charge of sex discrimination with the Equal Employment Opportunity Commission.[13] In spite of consistently "outstanding" performance ratings he has received no promotion since that date. In spite of his "outstanding" rating on appraisals, Robert Stastny has fared worse than the average of other comparables in salary grade and salary (as of December 31, 1975), number of promotions since July 1, 1966 and total amount of raises since July 1, 1966 (Plaintiffs' Exhibit 152). His personnel file which contains written comments from one superior, one former superior and one co-employee critical of his support for his wife's complaints against the company, helps to explain why.

Robert Stastny is an able and dedicated employee at Southern Bell. He has been qualified for promotions, and the defendant has not explained its failure to promote Mr. Stastny. The comparative poor treatment of Robert Stastny is no accident, and is the result of discrimination against him by defendant because of his wife's charges of sex discrimination against the defendant.

Marguerite Stastny is an able and dedicated employee. She was qualified for promotion to jobs as a Level 1 Account Manager after December 18, 1970; to Salary Class 2–A after December 18, 1972; to Salary Class 2–B after December 18, 1975. She sought promotion, was qualified for promotion, and was denied promotion to the following positions which were filled by less qualified males: (1) the Account Manager position to which Don Courtney was promoted on September 1, 1971; (2) the Second Level management position to which Don Courtney was promoted in December of 1972; (3) the vacancies into which Ernie Sides, Jack Gillis, and Harry Spangler were hired in 1970–71.

(b) *Lillie Andrews*: Plaintiff Andrews is a high school graduate (11 years) who has been with Southern Bell since June, 1946, and has been in management since November, 1955. Although she has been a part of

salary class increases since entering management, Mrs. Andrews has not received an individual promotion since 1956 and has never progressed beyond First Level of management.

Prior to Mrs. Andrews filing her first charge of sex discrimination against the defendant with the Equal Employment Opportunity Commission on October 20, 1971, these appraisals of her work indicated a solid employee with average to very good supervisory skills and special talents in the training area. For several months in 1970 and again in 1971, she was lent to AT&T headquarters in New York to train and supervise persons hired to handle communications with shareholders and the public regarding debentures and stock offerings by AT&T. The position required considerable independence and initiative in a sensitive area. In this position, Mrs. Andrews supervised college graduates and retired stock brokers. Her overall rating for her work in New York was "highly satisfactory." Her 1971 appraisal was "outstanding."

In spite of these appraisals, during this period three men were promoted over Mrs. Andrews who, compared to her, had minimal company experience. Each of these men had been brought into Mrs. Andrews' office, ostensibly as her supervisor, but in actuality to be trained in commercial operation by her. Each of the young men moved to a new position in the company after several months. Mrs. Andrews was never given a promotion into the position which the three men vacated or into the positions into which they moved. The company had then, and still has, no system for posting or bidding on management openings, and Mrs. Andrews was apparently never considered for any of these positions.

In January, 1972, the defendant promoted a male college graduate with an Economics major, Dave Williamson, Jr., into the position of Office Manager in Gastonia, a position to which Mrs. Andrews had requested promotion by letter to her District Supervi-

---

13. The charge referred to is not a charge involved in this suit but a previous charge filed by Plaintiff Stastny, previously litigated.

sor. Mr. Williamson had been with the company approximately six months at the time of his promotion and both appraisals in his file at the time of his promotion declined to rate his work on the grounds of "insufficient observation." Defendants presented no evidence either that Lillie Andrews was considered for the position or that she was less qualified than Dave Williamson, Jr.

In 1975 the defendant again favored Dave Williamson, Jr., with promotion over Mrs. Andrews, this time into a training position in the area Personnel Office for which Mrs. Andrews was well qualified. Mrs. Andrews had been consistently praised by her superiors through 1975 for her unique abilities in the training area, but she was not considered for the promotion. She was subsequently told by the defendant that Mr. Williamson was given the position because his previous job was being phased out and that, while the company had no knowledge of his training abilities, he would be given a chance.

Mrs. Andrews' raises over the period 1965 through 1976 have averaged 29% to 113% of those of a group of men who Mrs. Andrews testified had similar or later seniority with the company. Only after 1974 have Mrs. Andrews' raises been as much as 72% of those of the men in this group. These figures, combined with Mrs. Andrews' individual employment history, indicate the magnitude and continuing nature of the discrimination against her.

*Retaliation* : In the spring and summer of 1972, written appraisals were apparently made of Mrs. Andrews which questioned her supervisory, although not her training abilities, to some extent. Although plaintiffs did not show that all of these appraisals were written with actual knowledge of her EEOC complaints, it is clear that the 1972 appraisals corresponded with the winter of her discontent: both hers with her supervisors, and theirs with her. Although the immediate supervisor normally appraises an employee, Mrs. Andrews' supervisor, Texie Springs, signed an already typed appraisal of Mrs. Andrews. Shortly after the

company received official notification of her EEOC charges, a male superior of Mrs. Andrews, Ronald Stamey, began placing unsigned and undated notes from an employee suggestion box in her personnel file.

Mrs. Andrews has consistently and aggressively sought advancement within Southern Bell. She joined and continued her membership in the Administrative Management Society even after her supervisor advised her in 1967 or 68 that Southern Bell could not afford to pay the $15 per year dues for her that were paid for male Southern Bell members. She inquired about the need to seek additional education as a precondition for promotion and was told by her supervisor that no additional education was necessary.

The defendant has made no serious claim that Mrs. Andrews lacked or lacks any technical skills or knowledge of company operations necessary for promotion. Rather, it seems clear that defendant's promotional system based on the perceptions and assumptions of largely male supervisors, precluded Mrs. Andrews from ever being considered seriously for positions beyond First Level. Her "non-management attitudes" complained of at trial—e. g., "demanding" payment for overtime which company policy specified to be paid to management employees, speaking sympathetically with certain craft employees who complained of unequal distribution of craft overtime—mostly appear to be violations of an unwritten code of management conformity with no demonstrated relationship to job performance.

Mrs. Andrews was qualified for promotions within management. She was qualified for promotion to Salary Class 10 after December 18, 1968; to Salary Class 2–A after December 18, 1971; to Salary Class 2–B after December 18, 1973; to Level 3 after December 18, 1976.

Mrs. Andrews sought promotion, was qualified for promotion, and was denied promotion to the following vacancies that were filled by a less qualified male: (1) the Gastonia office manager position to which Dave Williamson was hired in January,

1972; (2) the training position in the Personnel Office to which Dave Williamson was hired in 1975; and (3) the vacancies to which three trainees, Chuck Hughes, Ken Adair, and Clem Huffman, were promoted during 1971 and 1972.

(c) *Texie Springs*: Plaintiff Springs has been with Southern Bell since 1944 and has been in management since 1955. Since entering management, Mrs. Springs has worked in the Traffic, Commercial and Sales Departments in North Carolina and in the Headquarters Planning Department in Atlanta, Georgia. Except for two appraisals during a six-month period in 1973, Mrs. Springs has been explicitly appraised as promotable on defendant's appraisal forms since at least 1971, but has not, as of May, 1977, been promoted above the current 1st level nor reached the level of promotion for which she was being recommended as early as 1971.

Mrs. Springs' first individual management promotion occurred in 1971 when she became a Level 8 office manager. The position had previously been held by several male employees who were each promoted to a better job after a few months. In May, 1974, Mrs. Springs was demoted back to a Level 7 business office supervisor (the same job she had held in 1956). Defendant contends that the 1974 demotion was attributable to the impersonal workings of the Management Job Evaluation (MJE) Program. However, many employees were apparently upgraded at the time of their job's re-evaluation; or were transferred into another position just before their job's downgrading; or were continued on jobs which, though very similar to Mrs. Springs', were not re-evaluated for one reason or another. Under the MJE, Mrs. Springs had a right to appeal the demotion but the defendant never advised her of that right. In 1976, she was promoted a second time to Level 1–E (formerly Level 8) where she now remains.

Mrs. Springs has had numerous assignments with Southern Bell which have involved either devising new business systems and employee procedures to go with them, or straightening out existing positions with a history of technical or personnel difficulties. In 1968 and 1969, she was placed in charge of both the teller and toll investigation group. The latter job entailed setting up North Carolina's first centralized investigation system for contested long distance billings. Mrs. Springs was praised for her work in both groups on several occasions by Ed Welch, defendant's North Carolina EEO coordinator, and a Third Level management employee.

In 1971, Mrs. Springs was assigned as office manager of the mechanized service order control group. This position had a history of rapid turnover, and involved supervision of entry level, relatively inexperienced craft employees and the implementation of new and complicated procedures. In spite of these impediments, Mrs. Springs continued to perform well and to be appraised as promotable in her work.

In 1974–1975, Mrs. Springs was assigned to Atlanta functional accounting headquarters. Her duties in connection with this job involved developing a uniform code for technical parts and equipment used throughout the AT&T system. The appraisals of her work in Atlanta reveal that the position required considerable initiative and independence. She was rated by her Atlanta supervisors as being "promotable now to practically any Second Level position." The salary performance rating for her work in Atlanta was "A-high," which rating would entitle her to raises above the maximum for her present salary grade. This salary performance rating was subsequently downgraded without any discussion with Mrs. Springs or notice to her by a higher level North Carolina male who had had no direct supervisory authority over her or opportunity to observe her work.

Mrs. Springs is presently in charge of North Carolina's centralized mail remittance center in Charlotte. Her responsibilities include supervision of the processing of almost $2 million per day in receipts by Southern Bell in North Carolina.

It has been Mrs. Springs' fate to be placed at a lower job level with lower pay than that of men who, either contempora-

neously with or subsequently to her, have been assigned virtually identical duties. This happened three times. In 1966–67, when Mrs. Springs was the business office supervisor of a business section in the Commercial Department, she was a Grade 7 supervisor (Level 1). Several months after she left the position she was replaced by John Bemont, then a high school graduate with approximately one semester of college and only a few months in management. The duties of the position did not change. Mr. Bemont took the position as a Second Level manager. Mrs. Springs was not offered this position before it was given to Mr. Bemont.

From October, 1971 through April, 1973 Mrs. Springs was the office manager for the MSOC group and was classified as a First Level manager, Grade 8. When she was transferred in 1973, John Bemont again replaced her as a Second Level manager with almost identical job duties. (Transcript, pp. 111–113, 1191.)

On a third such occasion, in approximately 1973, Mrs. Springs was assigned to a residence section. Although Mrs. Springs was listed on company forms as being promotable, she continued as a Grade 8, First Level management employee in her reassignment. The residence section, including Mrs. Springs, was formally under the supervision of Mr. Len Hall, a Second Level male manager, but in practice, he and Mrs. Springs divided the responsibilities of the section in half, with only symbolic distinctions in their duties.

None of the appraisals presented to the Court regarding Texie Springs contains either a formal or informal career plan or other discussion of how Springs might be cross-trained or otherwise prepared for future advancement. Mrs. Springs' raises over the period 1965 through 1976 have averaged 37% to 97% of the average raise for a group of men selected by her as being comparable in ability and seniority. Except for 1972, she never received a raise more than 71% of the average of the comparable male raises. These figures combined with Mrs. Springs' individual history indicate the

magnitude and continuing nature of the discrimination against her.

Defendant presented no evidence that Mrs. Springs lacked technical or operational knowledge necessary for promotion at Southern Bell, nor was she criticized at trial, or in prior appraisals, for serious deficiencies in personal relations which might have affected her management abilities.

Mrs. Springs was well qualified for promotions within management. She was qualified for promotions to vacancies in Salary Class 10 after December 18, 1968; in Level 2 after December 18, 1970; in Level 3 after December 18, 1973. In addition to her general qualifications for promotion, Mrs. Springs, but for discrimination, would have been classified as a Second Level manager when first assigned to the MSOC supervisory position in 1971 and also when assigned to the residence section with Mr. Len Hall in 1973.

(d) *Mary Rogers*: Plaintiff Rogers was first employed by the defendant in December, 1929. Except for a couple of years' leave of absence to bear her two children she was continuously employed until she retired on September 1, 1976. She started out as a telephone operator making $12.00 a week. She finished up as a Public Relations Manager making $21,200 per year. For her last 35 years with the company she was continuously employed in the Commercial Department. She entered management thirty years before she retired.

Starting in 1967 she was frequently a "loaned executive." This involved the defendant assigning her to work, full time and away from the telephone company premises, on local civic and cultural projects: e. g., in 1970 she spent 6 months as Director of Office Activities for the National Alliance of Businessmen, where she performed in outstanding fashion, directing the efforts of 18 men and managing the office (Tr. 43). All of her loaned executive assignments, however, did not require the full exercise of her skills. In 1972 she was assigned for one month to sell tickets to a local charity benefit tennis tournament. All told she spent about a quarter of her

last decade with the company working for somebody else. There was no testimony that company male management employees were assigned as "loaned executives" with any such frequency as Mrs. Rogers and she knew of no such employees. While Mrs. Rogers was off working elsewhere, her supervisors at Southern Bell did not have the opportunity to observe the quality of her work and she did not have the opportunity to keep up at first hand with technical changes being made in company operations. She was a "loaned executive" at the time of her retirement. Her personnel file is full of extremely commendatory letters from local "movers and shakers" regarding her work on these assignments. Apparently she was the person most frequently tapped by the telephone company, from 1965 to 1976, when the levy was made for volunteer help (including work on some political campaigns). Mrs. Rogers trained many men who went on to higher positions with Southern Bell and other telephone companies. From August 1, 1965, until March 11, 1968, she was the Manager of the Charlotte Public Office, responsible for 35 employees who handled incoming payments of telephone bills, complaints about erroneous billings, and typing of orders for telephone service installations.

On February 23, 1968, Mrs. Rogers wrote the company Vice President and General Manager and complained that she was not being promoted. She cited her experience of training men how to run a Business Office, so that they could then be promoted to become her supervisor or otherwise ascend the corporate ladder faster than she. She concluded that the reason that she was not getting promoted was that she was not a man. The Vice President wrote her back four days later and promised an investigation. Another four days later her boss, Ed Welch (now the company Equal Employment Opportunity Coordinator) called her into his office and angrily stated that he could not understand her writing directly to the Vice President (Tr. 53) (though the Vice President had an announced "open door policy" (Tr. 95–96)). Mrs. Rogers and Mr. Welch had some conversation about whether he had taken her requests for promotion seriously and whether she had been responsible for some funds being left overnight in the company safe contrary to regulations. (No money was lost, and Mrs. Rogers had been assigned to a different section at the time (Tr. 54).)

Shortly after this conversation, on March 11, 1968, she was laterally transferred to the Forecast Section of the Commercial Department. Such moves are almost invariably made on the 1st or the 15th of the month. She had no prior experience qualifying her for Forecast work. She was never given any formal training on how to perform her job there. She nevertheless learned to perform it in an outstanding fashion, so much so that on September 28, 1970 her supervisor recommended her promotion, saying:

"Mrs. Rogers not only does an outstanding job on her present assignment but also excels as a leader in training and personnel work. She is very cooperative with other groups and individuals and is an industrious worker in all activities undertaken.

In view of her years of outstanding performance, as shown above, I recommend that Mrs. Rogers be promoted to Forecast Supervisor in the North Carolina Area, which is a Level 12 job title. The Georgia Area office has had a woman on this assignment for several years. Also, recently in North Carolina the Accounting and Traffic Departments have promoted two of their female supervisors into the Level 12 salary classification."

After Mrs. Rogers was transferred away from the Charlotte Public Office, she never held another line (command) position with the company. She received only one promotion in the eleven years that she worked for the company after Title VII came into effect. Her transfer to the Forecast Department was in retaliation for her complaint to the Vice President.

At the time of her retirement, Mrs. Rogers was rated "206Y," which translates as "promotable, now, to staff and line, and to 3 or more departments."

Mary Rogers was an outstanding employee of the defendant from July 2, 1965, until her retirement. She is an agreeable, attractive, intelligent, experienced, competent, tactful, persistent, and gracious woman and executive. She frequently requested promotion. She has been the subject of discrimination that was blatant and direct as late as the transfer in 1968. This discrimination followed her in various subtle forms the last eleven years of her employment. A comparison of Mrs. Rogers' abilities with those of Mr. Stamey indicates that Mrs. Rogers was more qualified that Mr. Stamey for: (1) the district commercial manager job to which he was hired in 1971, and (2) the district plant manager's job to which he was hired in 1974. In general, she was qualified for promotion to Level 2 after July 2, 1965; to Level 3 after July 2, 1968; to Level 4 after July 2, 1971.

## CONCLUSIONS OF LAW

1. The court has jurisdiction of the subject matter. 42 U.S.C. § 2000e–5(f).

2. The court has jurisdiction of the person of the defendant.

3. Plaintiffs have standing.

4. The defendant is an employer engaged in an industry affecting commerce, and has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar years, within the meaning of 42 U.S.C. § 2000e(b).

5. Plaintiffs have complied with the procedural requirements of 42 U.S.C. §§ 2000e–5(e) and (f).

6. This is an appropriate class action under F.R.C.P. Rule 23(a) and 23(b)(2). Plaintiffs are appropriate class representatives. The class is defined as follows:

a. All females employed in North Carolina in management positions since September 19, 1970, who have been classified, restricted, discriminated against, or otherwise deprived of employment opportunities or status because of their sex, and

b. All females (including female craft employees of the defendant) who, since September 19, 1970, have been denied employment in management positions in North Carolina on account of their sex.

7. Since September 19, 1970 (ninety days prior to the December 18, 1970, filing of plaintiff Stastny's first charge with the Equal Employment Opportunity Commission), the defendant has intentionally engaged in a pattern, practice and policy of discrimination against plaintiffs and members of the class on account of their sex, thereby depriving them of equal employment opportunities in violation of 42 U.S.C. §§ 2000e–2(a), 2000e–3, and 2000e–5(g). The background evidence from before that date is consistent with this finding, a continuing pattern and practice of discrimination is found to have existed back to at least July 2, 1965. This discrimination has been accomplished by:

(a) Denial of management opportunities to each individual plaintiff because she is a woman, and additionally with respect to plaintiffs Stastny, Andrews and Rogers because they complained about discriminatory treatment, and further additionally with respect to plaintiff Stastny because her husband supported her in her complaints and actions against the defendant; and

(b) Denial of management opportunities to plaintiffs and members of the class by concentration of women in certain departments and in lower management levels, which has been accomplished by:

(i) Denying non-management women employees entry into management;

(ii) Denying women employees promotion within management;

(iii) Denying management women employees equal pay within the same salary class;

(iv) Denying women cross-training and developmental job assignments; and

(v) Use of a subjective annual appraisal system, based on criteria not shown to be job-related, under which women rarely appraise men, ratings are keyed to promotional and pay success, on occasion women are not given

annual appraisals, and men receive more than a proportionate share of favorable appraisals.

(c) The court recognizes that the defendant is presently subject to the consent decrees of January 18, 1973 and May, 1974. These decrees announced a change in the official policy of the defendant. The continuation thereafter of sex discriminatory practices, shown by the findings herein, was contrary to the company policy and the national policy of The American Telephone and Telegraph Company. The defendant's compliance with the consent decrees will be given substantial weight in the formulation of appropriate equitable remedies, as a matter of fact and evidence in any relevant contested issues involving events occurring since the consent decrees, and as to money payments already made and promotional goal settings for the job classes covered by the decrees. Particularly, the court would instruct the Master hereafter appointed that the target mechanisms and the ultimate goals of the consent decrees approximate proper promotional rates and goals for class members, and that all amounts paid to members of the class by the defendant pursuant to either consent decree shall be subtracted from any moneys found due to such claimant. Payments under releases pursuant to the consent decrees shall be subject to paragraph 15, hereafter.

8. The relevant date for determining the defendant's liability to plaintiffs and the members of the class for back pay is December 18, 1968 (two years before plaintiff Stastny filed her first charge with the Equal Employment Opportunity Commission).

9. Plaintiffs and members of the class have suffered and are continuing to suffer substantial loss of earnings because of the defendant's sexually discriminatory patterns, practices and policies.

10. Plaintiffs and members of the class are entitled to injunctive relief and back and front pay.

11. (a) Plaintiff Stastny is entitled to share in back pay, along with other class members who qualify, for the following specific vacancies: 1) the Account Manager position to which Don Courtney was promoted on September 1, 1971; 2) the Second Level management position to which Don Courtney was promoted in December of 1972; 3) the vacancies into which Ernie Sides, Jack Gillis, and Harry Spangler were hired in 1970–71. See *White v. Carolina Paperboard Corp.*, 564 F.2d 1073 (4th Cir. 1977). In seeking other back pay awards before the Master, Ms. Stastny will be considered qualified for promotion to Level 1 Account Manager vacancies after December 18, 1970; to Salary Class 2–A vacancies after December 18, 1972; and to Salary Class 2–B vacancies after December 18, 1975. For specific vacancies at those levels after the indicated times, she is entitled to back pay subject to defenses appropriately raised before the Master.

(b) Plaintiff Andrews is entitled to share in back pay, along with other class members who qualify, for the following specific vacancies: 1) the Gastonia office manager position to which Dave Williamson was hired in January 1972; 2) the training position in the Personnel Office to which Dave Williamson was hired in 1975; and 3) the vacancies to which three trainees, Chuck Hughes, Ken Adair, and Clem Huffman, were promoted during 1971 and 1972. In seeking other back pay awards before the Master, Ms. Andrews will be considered qualified for promotion to Salary Class 10 vacancies after December 18, 1968; to Salary Class 2–A vacancies after December 18, 1971; to Salary Class 2–B vacancies after December 18, 1973; and to Level 3 vacancies after December 18, 1976. For vacancies at those levels after the indicated times, she is entitled to back pay subject to defenses appropriately raised before the Master.

(c) Plaintiff Springs is entitled to back pay for the failure of the defendant to promote her to Second Level management in conjunction with her job assignments in 1971 as office manager for the MSOC group and in 1973 when she was assigned to the

residence section. In seeking other back pay awards before the Master, Ms. Springs will be considered qualified for promotion to Salary Class 10 after December 18, 1968; to Level 2 after December 18, 1970; to Level 3 after December 18, 1973. For vacancies at those levels after the indicated times, she is entitled to back pay subject to defenses appropriately raised before the Master.

(d) Plaintiff Rogers is entitled to share in back pay, along with other class members who qualify before the Master, for the following specific vacancies: 1) the district commercial manager job to which Mr. Stamey was hired in 1971, and 2) the district plant manager's job to which Mr. Stamey was hired in 1974. In seeking back pay awards before the Master, Ms. Rogers will be considered qualified for promotion to Level 2 and Level 3 vacancies after December 18, 1968; and to Level 4 vacancies after July 2, 1971. For vacancies at those levels after the indicated times, she is entitled to back pay subject to defenses appropriately raised before the Master.

Where reference is made to current salary class designations above for years in which they did not exist, the historically equivalent designation will apply.

All plaintiffs are entitled to back pay at a rate at least equal to the average for similarly situated males in the salary class to which they should have been promoted as of the date they should have been promoted. Each plaintiff is also entitled to front pay, except plaintiff Rogers, who is retired.

12. Plaintiffs and members of the class are not barred by laches.

13. Neither consent decree is an "opinion" within the meaning of 42 U.S.C. § 2000e–12(b).

14. Neither consent decree bars class relief in this case.

15. Employees of defendant who signed releases of Title VII rights and accepted settlement pursuant to either consent decree or otherwise are barred from further monetary recovery on account of occurrences prior to the date of such releases, except that employees who signed releases after the date this action was certified as a class action and have not been shown to have knowingly released their claims are not barred. *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 52, n. 15, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974); *see Rodgers v. United States Steel Co.*, 70 F.R.D. 639, 11 EPD ¶ 10,762 (W.D.Pa.1976). The defendant may later make a showing that such employees have in fact knowingly released their claims, since this matter was not focused on at trial.

16. The defendant will be enjoined to eliminate all employment practices based on sex in violation of Title VII. The defendant will be enjoined to post at appropriate conspicuous places within the company a notice of each management job vacancy at the earliest practicable point that the same becomes known, which notice shall state the title of the position, an objective description of the duties of the position, an objective description of the minimum qualifications required to hold the position, a statement of the entry pay or pay ranges, and the name, address and telephone number of the person or persons to whom applications for such position may be made. The defendant will be enjoined to appraise each woman management employee annually, as long as such practice remains a company requirement. The defendant will be enjoined to continued operating under the goals established in the consent decrees until it achieves 20% women in AAJC–1, and 38% women in AAJC–2 and AAJC–3. This paragraph applies only to the defendant's North Carolina operations and the class involved in this case.

17. This action will be referred to a Master, pursuant to F.R.C.P. 53, for determination of appropriate back and front pay.

18. An interim award of counsel fees and expert witness fees and costs to plaintiffs is appropriate at this time. A separate order is entered in this regard.

19. Plaintiffs will tender a partial judgment appropriate under the foregoing findings and conclusions.

## 348

### PARTIAL JUDGMENT

These are four consolidated class actions which allege sex discrimination in violation of 42 U.S.C. § 2000e. They were tried to the court commencing May 23, 1977. Findings of Fact and Conclusions of Law were entered on March 20, 1978.

NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED as follows:

1. The Court has jurisdiction of the subject matter. 42 U.S.C. § 2000e-5(f).

2. The court has jurisdiction of the person of the defendant.

3. Plaintiffs have standing.

4. The defendant is an employer engaged in an industry affecting commerce, and has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar years, within the meaning of 42 U.S.C. § 2000e(b).

5. Plaintiffs have complied with the procedural requirements of 42 U.S.C. § 2000e-5(e) and (f).

6. This is an appropriate class action under F.R.C.P. Rule 23(a) and 23(b)(2). Plaintiffs are appropriate class representatives. The class is defined as follows:

a. All females employed in North Carolina in management positions since September 19, 1970, who have been classified, restricted, discriminated against, or otherwise deprived of employment opportunities or status because of their sex, and

b. All females (including female craft employees of the defendant) who, since September 19, 1970, have been denied employment in management positions in North Carolina on account of their sex.

7. Since September 19, 1970 (ninety days prior to the December 18, 1970, filing of plaintiff Stastny's first charge with the Equal Employment Opportunity Commission), the defendant has intentionally engaged in a pattern, practice and policy of discrimination against plaintiffs and members of the class on account of their sex, thereby depriving them of equal employment opportunities in violation of 42 U.S.C. §§ 2000e-2(a), 2000e-3, and 2000e-5(g).

The background evidence from before that date is consistent with this finding. A continuing pattern and practice of discrimination is found to have existed back to at least July 2, 1965. This discrimination has been accomplished by:

(a) Denial of management opportunities to each individual plaintiff because she is a woman, and additionally with respect to plaintiffs Stastny, Andrews and Rogers because they complained about discriminatory treatment, and further additionally with respect to plaintiff Stastny because her husband supported her in her complaints and actions against the defendant; and

(b) Denial of management opportunities to plaintiffs and members of the class by concentration of women in certain departments and in lower management levels, which has been accomplished by:

(i) Denying non-management women employees entry into management;

(ii) Denying women employees promotion within management;

(iii) Denying management women employees equal pay within the same salary class;

(iv) Denying women cross-training and developmental job assignments; and

(v) Use of a subjective annual appraisal system, based on criteria not shown to be job-related, under which women rarely appraise men, ratings are keyed to promotional and pay success, on occasion women are not given annual appraisals and men receive more than a proportionate share of favorable appraisals.

(c) The court recognizes that the defendant is presently subject to the consent decrees of January 18, 1973 and May, 1974. These decrees announced a change in the official policy of the defendant. The continuation thereafter of sex discriminatory practices shown by the findings herein, was contrary to the company policy and the national policy of The American Telephone and Telegraph Company. The defendant's compliance with

the consent decree has been given substantial weight in the formulation of appropriate equitable remedies, as a matter of fact and evidence in any relevant contested issues involving events occurring since the consent decrees, and as to money payments already made and promotional goal settings for the job classes covered by the decrees. Particularly, the court will instruct the Master hereafter appointed that the target mechanisms and the ultimate goals of the consent decrees approximate proper promotional rates and goals for class members, and that all amounts paid to members of the class by the defendant pursuant to either consent decree shall be subtracted from any monies found due to such claimant. Payments under releases pursuant to the consent decrees shall be subject to paragraph 15, hereafter.

8. The relevant date for determining the defendant's liability to plaintiffs and the members of the class for back pay is December 18, 1968 (two years before plaintiff Stastny filed her first charge with the Equal Employment Opportunity Commission).

9. Plaintiffs and members of the class have suffered and are continuing to suffer substantial loss of earnings because of the defendant's sexually discriminatory patterns, practices and policies.

10. Plaintiffs and members of the class are entitled to injunctive relief and back and front pay.

11. (a) Plaintiff Stastny is entitled to share in back pay, along with other class members who qualify, for the following specific vacancies: 1) the Account Manager position to which Don Courtney was promoted on September 1, 1971; 2) the Second Level management position to which Don Courtney was promoted in December of 1972; 3) the vacancies into which Ernie Sides, Jack Gillis, and Harry Spangler were hired in 1970–71. See *White v. Carolina Paperboard Corp.*, 564 F.2d 1073 (4th Cir. 1977). In seeking other back pay awards before the Master, Ms. Stastny will be considered qualified for promotion to Level 1

Account Manager vacancies after December 18, 1970; to Salary Class 2–A vacancies after December 18, 1972; and to Salary Class 2–B vacancies after December 18, 1975. For specific vacancies at those levels after the indicated times, she is entitled to back pay subject to defenses appropriately raised before the Master.

(b) Plaintiff Andrews is entitled to share in back pay, along with other class members who qualify, for the following specific vacancies: 1) the Gastonia office manager position to which Dave Williamson was hired in January 1972; 2) the training position in the Personnel Office to which Dave Williamson was hired in 1975; and 3) the vacancies to which three trainees, Chuck Hughes, Ken Adair, and Clem Huffman, were promoted during 1971 and 1972. In seeking other back pay awards before the Master, Ms. Andrews will be considered qualified for promotion to Salary Class 10 vacancies after December 18, 1968; to Salary Class 2–A vacancies after December 18, 1971; to Salary Class 2–B vacancies after December 18, 1973; and to Level 3 vacancies after December 18, 1976. For vacancies at those levels after the indicated times, she is entitled to back pay subject to defenses appropriately raised before the Master.

(c) Plaintiff Springs is entitled to back pay for the failure of the defendant to promote her to Second Level management in conjunction with her job assignments in 1971 as office manager for the MSOC group and in 1973 when she was assigned to the residence section. In seeking other back pay awards before the Master, Ms. Springs will be considered qualified for promotion to Salary Class 10 after December 18, 1968; to Level 2 after December 18, 1970; and to Level 3 after December 18, 1973. For vacancies at those levels after the indicated times, she is entitled to back pay subject to defenses appropriately raised before the Master.

(d) Plaintiff Rogers is entitled to share in back pay, along with other class members who qualify before the Master, for the following specific vacancies: 1) the district

commercial manager job to which Mr. Stamey was hired in 1971, and 2) the district plant manager's job to which Mr. Stamey was hired in 1974. In seeking back pay awards before the Master, Ms. Rogers will be considered qualified for promotion to Level 2 and Level 3 vacancies after December 18, 1968; and to Level 4 vacancies after July 2, 1971. For vacancies at those levels after the indicated times, she is entitled to back pay subject to defenses appropriately raised before the Master.

Where reference is made to current salary class designations above for years in which they did not exist, the historically equivalent designation will apply.

All plaintiffs are entitled to back pay at a rate at least equal to the average for similarly situated males in the salary class to which they should have been promoted as of the date they should have been promoted. Each plaintiff is also entitled to front pay, except plaintiff Rogers, who is retired.

12. Plaintiffs and members of the class are not barred by laches.

13. Neither consent decree is an "opinion" within the meaning of 42 U.S.C. § 2000e–12(b).

14. Neither consent decree bars class relief in this case.

15. Employees of defendant who signed releases of Title VII rights and accepted settlement pursuant to either consent decree or otherwise are barred from further monetary recovery on account of occurrences prior to the date of such releases, except that employees who signed releases after the date this action was certified as a class action and have not been shown to have knowingly released their claims are not barred. *Alexander v. Gardner Denver Co.*, 415 U.S. 36, 52, n. 15, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974); see, *Rodgers v. United States Steel Co.*, 70 F.R.D. 639, 11 EPD 10,762 (W.D.Pa.1976). The defendant may later make a showing that such employees have in fact knowingly released their claims, since this matter was not focused on at trial.

16. The defendant shall be and is hereby enjoined to eliminate all employment practices based on sex in violation of Title VII. The defendant shall be and is hereby enjoined to post at appropriate conspicuous places within the company a notice of each management job vacancy at the earliest practicable point that the same becomes known, which notice shall state the title of the position, an objective description of the duties of the position, an objective description of the minimum qualifications required to hold the position, a statement of the entry pay or pay ranges, and the name, address and telephone number of the person or persons to whom application for such position may be made. The defendant shall be and is hereby enjoined to appraise each woman management employee annually, as long as such practice remains a company requirement. The defendant shall be and is hereby enjoined to continue operating under the goals established in the consent decrees until it achieves 20% women in AAJC–1, and 38% in AAJC–2 and AAJC–3. This paragraph applies only to the defendant's North Carolina operations and the class involved in this case.

17. This action will be referred to a Master, pursuant to F.R.C.P. 53, for determination of appropriate back and front pay.

18. The plaintiffs shall be and are hereby awarded their costs in this action, including their expenses and reasonable counsel fees. A reasonable fee for the services rendered through September 27, 1977, by plaintiffs' attorneys in this case is $225,000.00. Plaintiffs shall have and recover of the defendants at this time as follows:

(a) Costs and expenses in the amount of $7,530.34;

(b) An expert witness fee for the testimony of Dr. Lonnie Keith in the amount of $300.00; and

(c) An interim attorneys' fee in the amount of $125,000.00.

The interim fee awarded herein will be credited against any final award of fees that may be made.

19. A final assessment of fees and a final fee order will be made at the conclusion of the litigation.

### ORDER OF REFERENCE TO A MASTER

The court hereby refers Phase II hearings in the above styled matter to the master named below, subject to the following:

1. *Back pay and front pay on account of failure to promote or hire women from non-management and promote them within management.—*

(a) The master will determine those members of the class who, but for defendant's discrimination against women, would have been promoted or hired from non-management or promoted within management at any time from December 18, 1968, to date, and the positions and pay to which they would have been hired or promoted. The defendant is directed to furnish the master within forty-five days from the date of filing of this order with a list of all hires or promotions from non-management to management and promotions within management ("vacancies") which have occurred since December 18, 1968, when they occurred, and the name and sex of the person who filled such vacancy. The company shall also furnish the master a detailed statement, in plain and accurate English, of the definitions of "promotion" and "hire" used in deriving such list.

(b) A notice to class members is being issued contemporaneously. Class members may forward their claims to the master. The master shall first determine whether each claimant has been an employee of the defendant on or after September 19, 1970. If she has been so employed, the master shall determine which promotions or hires into management and promotions within management, if any, would have been given to claimant but for discrimination based upon sex. The case of each claimant is to be dealt with individually, but more than one class member may compete and qualify for back pay for any one vacancy.

Proof of the information called for by the proof of claim form shall amount to a *prima facie* showing of entitlement to such vacancies occurring after December 18, 1968, and before January 18, 1973; as to vacancies occurring during that period defendant must satisfy the master by clear and convincing evidence that an applicant was not qualified or was less qualified than the male actually hired for such vacancy in order to prevail. As to vacancies occurring after January 18, 1973, the burden will be upon the claimant to show that it is more likely than not that she was more qualified than the person who filled the vacancy in order to be judged entitled to it. Where there are multiple claimants whom the master finds under the appropriate standard to be more qualified than the male chosen to fill that position, the master shall proceed to award back pay in accordance with the standards described in *White v. Carolina Paperboard Corp.*, 564 F.2d 1073 (4th Cir. 1977).

(c) Deciding whether a particular claimant would have gotten a particular promotion, or would have been hired or promoted into management will require the exercise of considerable intelligence and discretion on the part of the master. The master should be guided to the extent possible by the *White v. Carolina Paperboard Corp.* opinion previously cited. He should give attention to the appropriateness of any goals and standards which may have been assumed by the defendant in the consent decrees. He may consider that about eighty-seven percent of persons first coming into management have been non-management employees of Southern Bell itself rather than outside hires. He may consider the qualifications of applicants and the qualifications that female claimants would have had if they had been promoted equally with males. Various types of seniority may be considered in weighted or other fashion as the master may determine. The essence of the job is to try to figure out under the facts of each case on principles of equity and fairness where

352

each claimant would be and would have been but for discrimination based on sex.

(d) For all women determined to have been discriminatorily denied vacancies on account of their sex, the master shall also compute the time it will require for such women to reach the place at which they would now be entitled to be but for defendant's sex discrimination.

(e) The master shall award front and back pay to each claimant found to have been discriminatorily denied a vacancy. Back pay shall be computed as the difference between what the member of the class would have earned, less what she in fact earned, less additional earnings she could have realized in the exercise of reasonable diligence (the court expects that only in the unusual case would this last factor be pertinent). Earnings shall be appropriately adjusted for additional Social Security, retirement contributions, vacation and vacation pay, sick leave and sick pay, and other such emoluments as pertain to company wages. Interest shall be allowed at 8%, compounded monthly. Front pay shall be the expectable difference in earnings (adjusted as stated above) that will be suffered by the entitled member of the class until she expectably reaches her rightful pace, discounted at 8% compounded monthly.

(f) Payment of front pay to an employee shall be no admission of a duty to promote, nor any undertaking or commitment by the defendant to promote such employee.

(g) The attention of the master is called to the fact that, under *White v. Carolina Paperboard Corp., supra*, a claimant who was not promoted is not necessarily entitled to the full benefits individually of the job which she was denied, but may be required to share those benefits with others eligible simultaneously for the same promotion and benefits. Careful attention should be given to the *White* formula in dealing with the situation of each claimant.

(h) In making determinations about entitlement to promotion at any particular time, the master will take into account the availability of a given woman to accept a promotion and perform the job at any particular pertinent time. Of course, if a given vacancy for entry into management or promotion within management was filled by a female, that vacancy should not be numbered among those available to these claimants.

2. *Back pay on account of failure to pay women equally for equal work.—*

The master shall determine those claimants who, but for defendant's discrimination against women, would have received more pay for performing work equal to that performed by male employees at any time from December 18, 1968, to date. Back pay shall be awarded to successful claimants for the difference between the amount that they would have earned but for discrimination and the amount actually earned. The difference in earnings shall be appropriately adjusted in a manner similar to that stated in paragraph 1(e) above. The master will exclude from consideration all females who have not been employed by the company on or after September 19, 1970.

In determining whether back pay is deserved for an equal pay claim, the master should compare the claimant's pay with that of similarly situated males for each time period during which the claimant alleges that she was denied equal pay for equal work. In addition to other information he may deem appropriate, the master may require the defendant to produce statistics which show the average most-favored-sex pay for salary classes in which claimants allege equal pay discrimination.

Proof that a claimant's pay was less than the average most-favored-sex pay for salary classes in which males are the favored sex shall amount to a *prima facie* showing of entitlement to back pay for the difference between the claimant's pay and the average male pay for the appropriate salary class and time period. After this *prima facie* showing, the defendant must bear the burden of proving it is more likely than not that the claimant was not the subject of discrimination or does not deserve a back

pay award calculated by the above formula. Absent such *prima facie* showing, the claimant must bear the burden of proving it is more likely than not that she was the subject of equal pay discrimination and is entitled to a back pay award.

In determining whether there was equal pay discrimination against particular claimants and how much back pay to award successful claimants, the master may consider the objective characteristics of the claimant, the objective characteristics and pay of other employees in the same salary class, the evidentiary value of the average male pay for salary classes in which there are few males, and any other relevant factors. The effect of releases and settlement payments pursuant to either consent decree is defined in paragraphs 7(c) and 15 of the conclusions of law, filed March 20, 1978.

3. As to the named plaintiffs, Stastny, Andrews, Springs and Rogers, the court has already made detailed findings and conclusions of law which need not be reconsidered and which have established the eligibility of those individuals for back pay and front pay and interest and other benefits. Those findings should not be reconsidered nor reevaluated by the special master. Nevertheless, it will be required of the master as to those four plaintiffs along with others in the class that he determine what promotion opportunities were available at various times following denial of promotion to them and the manner in which they and other members of the class as individuals will share in the benefits that may be found due under the court's previous orders or under additional determinations by the master.

4. *General instructions to the master.—*

(a) The master is requested to read carefully the following:

(1) The findings of fact and conclusions of law which have been entered by the court pursuant to the trial; and

(2) The decision of the Fourth Circuit Court of Appeals (copy attached), in the case of *White v. Carolina Paperboard Corp.,* 564 F.2d 1973 (4th Cir. 1977).

(b) Facts found and conclusions of law found by the court should be accepted by the master and need not be relitigated unless following application to the court by the master a correction of those findings and conclusions shall have been made.

(c) The instructions of the Circuit Court contained in *White v. Carolina Paperboard Corp., supra,* as to how back pay shall be computed and determined shall to the extent applicable be followed. If those instructions do not answer all questions that arise, the master is instructed to use his common sense; failing that, he should apply to the court for advice and further instructions.

(d) The master may require any party to supply further computer data, studies or translations, in his discretion.

(e) This order does not preclude agreement otherwise between the parties. Such agreement is encouraged.

(f) Proceedings before the master shall not be stayed except by order of the master or order of the court. Application by a party for action by the court does not stay proceedings before the master.

(g) Costs, counsel fees and expenses incurred by the plaintiffs and the master, which are necessary and reasonable for the proceedings before the master, shall be taxed against the defendant. From the date of this order, the plaintiffs and master shall submit monthly statements of fees, costs and expenses to be paid within twenty days of receipt by the defendant. If the defendant contends any such statements are unreasonable, the court will hold a prompt hearing.

(h) The Federal Rules of Civil Procedure and of Evidence shall govern proceedings before the master. The master may hold such other hearings and issue such other orders as may be appropriate for the orderly and efficient performance of his duties and are not inconsistent with prior orders of this court or controlling case law.

5. *Designation of master.—*Pursuant to Rule 53 of the Federal Rules of Civil Procedure, Mr. James O. Cobb, Attorney, Suite 2100, Jefferson-First Union Plaza, Char-

lotte, North Carolina 28282, is hereby appointed master to determine amounts of back pay and front pay and interest due the named plaintiffs and the other members of the class previously defined in the conclusions of law and to submit to the court a memorandum of findings and recommendations and a judgment which the master proposes to have entered.

6. *Time schedule.*—The master shall schedule hearings for the determination of back pay and front pay for the class members as provided herein. He shall file his findings and recommendations on or before six months from the date of this order. Counsel for the parties will be notified by the clerk of the dates and times for hearings to be held before the master.

7. This order may be corrected or amended as the court may find appropriate.